**Jeffrey L. BLACK, Respondent Below, Appellant,**

v.

**Cindy M. GRAY, Petitioner Below, Appellee.**

Supreme Court of Delaware.

Submitted: Nov. 3, 1987.
Decided: April 14, 1988.

Craig A. Karsnitz (argued) and Elizabeth K. Rodriguez, of Young, Conaway, Stargatt & Taylor, Georgetown, for appellant.

Edward R. McNamara (argued), of Barros, McNamara & Scanlon, P.A., Dover, for appellee.

Before CHRISTIE, C.J., HORSEY, MOORE, WALSH and HOLLAND,

Justices, constituting the Court en Banc.

MOORE, Justice.

Jeffrey L. Black [1] appeals a ruling of the Family Court terminating his parental rights in his seven year old daughter, Tiffany. For the first time we consider the scope of the grounds for termination of such rights under 13 *Del.C.* § 1103 (1981), where a parent has abandoned a child in the past, but thereafter, and before the filing of a termination petition, attempts in good faith to exercise his parental responsibilities. In the face of a pending petition by the father for visitation rights with Tiffany, the mother, Cindy M. Gray, petitioned to terminate the father's rights on the grounds of an earlier abandonment. However, at that time the circumstances of the prior abandonment no longer existed. The Family Court concluded (1) that the father had abandoned his daughter and (2) that it was in Tiffany's best interest to terminate her father's parental rights. In our opinion the Family Court erred in its interpretation of the law and application of the facts thereto. Under 13 *Del.C.* § 1103 (1981) an abandonment is not an irrevocable act. Accordingly, we reverse.

## I.

Tiffany was born on July 3, 1980. Her parents separated about three months later, due in part to the father's alcohol abuse. There were several unsuccessful attempts at reconciliation, but the parties finally separated in July 1981 and were divorced.

After their initial separation in 1980, the mother and father agreed to an order requiring the latter to pay child support of $30 per week. According to the mother, Black met this obligation for approximately ten months. During this time Black consistently maintained contact with Tiffany. However, after the divorce his contacts with Tiffany became infrequent until eventually both contact and support virtually ceased. Several interrelated factors account for this situation.

In 1981 the Family Court granted the father visitation privileges, but the parties were to agree on the details. Due to the personal animosity between them, the parties never established a definite visitation schedule. There is evidence that the mother rebuffed Black's attempts to see Tiffany between 1981 and 1985, because he was living with a woman to whom he was not then married. Consequently, the father's only contact with Tiffany was at his mother's house during Christmas of 1981, 1982 and 1983. Even these annual visits stopped in 1984 and 1985 without any apparent effort by the parties to arrange more frequent contacts.

However, the mother contends that Black made little or no effort to see his daughter between 1981 and 1985. She also denies any attempt to prevent him from visiting or developing a relationship with the child, and claims that she and other members of her family initially encouraged such a relationship.

The father's personal life was perhaps the primary cause of the problem. His abuse of alcohol, coupled with the disintegration of his marriage, adversely affected his relationship with Tiffany. When these problems were at their worst, the father's contacts with Tiffany had virtually ceased. However, in 1983, the father began to turn his life around. He stopped drinking, developed a serious relationship with a woman he eventually married, joined a church and secured gainful employment.

In October, 1985, Black petitioned the Family Court for visitation rights. Despite court-ordered mediation, the parties could not resolve their differences and in January 1986, the mother petitioned the Family Court to terminate the father's parental rights. Black's visitation proceedings were stayed pending a ruling on the mother's petition.

In terminating the father's parental rights, the Family Court found that Black had at one time abandoned his daughter. The court also concluded that termination was in Tiffany's best interest. The trial

1. The Court has used pseudonyms to protect the identities of the parents and child.

judge so ruled despite findings (1) that the father had turned his life around and was capable of exercising his parental responsibilities and (2) that it would be important to Tiffany's further development for her to know and have a relationship with her natural father.

On appeal the father contends that there was insufficient evidence to support the Family Court's findings and conclusions. He argues that the trial court ignored applicable law requiring the mother to show by clear and convincing evidence that an intent to abandon existed at the time termination was sought. Black also claims that there was insufficient evidence to sustain a conclusion that Tiffany's best interests would be served by such termination.

## II.

A Family Court decision terminating parental rights must be supported by clear and convincing evidence consistent with the applicable legal criteria. Where such proof fails, or the conclusions of the trial court are not the product of an orderly and logical deductive process, we must reverse. *Wife (J.F.V.) v. Husband (O.W.V. Jr.)*, Del. Supr., 402 A.2d 1202, 1204 (1979); *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972); *In re Burns*, Del.Supr., 519 A.2d 638, 643 (1986).

■ A court may terminate a parent's rights only if "1) facts justifying termination of parental rights exist and (2) such termination would be in the best interest of the child." *Daber v. Division of Child Protective Serv.*, Del.Supr., 470 A.2d 723 (1983); *Cline v. Hartzler*, Del.Supr., 227

A.2d 210, 212 (1967). The first part of this test may be satisfied if one of the criteria of 13 *Del.C.* § 1103 (1981) is met.[2] The Family Court found that § 1103(3), which allows termination based upon abandonment of the child, was satisfied. This is clear error.

■ Abandonment is defined by 13 *Del. C.* § 1101(1) (1981):

(1) "Abandoned" shall be interpreted as referring to any child who, for a period of 6 months, or to any newborn infant who, for a period of 90 days, has not received any regular and reasonable financial help from his parent or parents or any person having parental rights or responsibility and on whose behalf no substantial contacts have been initiated by his parent or parents or any person having parental rights or responsibility during that period.

In addition to these statutory requirements for abandonment, a court must also find a "settled purpose" on the parent's part to abandon his child and to surrender all further parental claims to the child. *Cline*, 227 A.2d at 212. That connotes a present continuing intent to abandon up to the time the termination proceedings are filed. In determining such intent we must view evidence not only of subjective intent, but of conduct as well. *Cline*, 227 A.2d at 212; *Division of Soc. Serv. v. Tusiki*, Del.Fam. Ct., 446 A.2d 1109, 1111 (1982).

It is clear that for a time Black "abandoned" Tiffany as that term is defined in § 1101(1). But that neither ends the matter nor meets the test of *Cline*. Certainly Black's contacts with his daughter from

**2.** The pertinent provisions of 13 *Del.C.* § 1103 (1981) are:

The procedure for termination of parental rights for the purpose of adoption or, if a suitable adoption plan cannot be effected, for the purpose of providing for the care of the child by some other plan which may or may not contemplate the continued possibility of eventual adoption, may be initiated whenever it appears that:

(3) Any child has been abandoned; or

\* \* \* \* \* \*

(5) The parent or parents of any child, or any person holding parental rights over such child, are not able, or have failed, to plan

adequately for the child's physical needs or his mental and emotional health and development and:

\* \* \* \* \* \*

b. In the case of a child in the home of the stepparent or blood relative:

1. The child has resided in the home of the stepparent or blood relative for a period of at least 1 year; *and*

2. The Court finds the noncustodial parent or parents incapable of exercising parental responsibilities, *and* that there appears to be little likelihood such parent or parents will be able to exercise such parental responsibilities in the foreseeable future. (emphases added).

1981 to 1985, and his financial support of her during that time, were sporadic. In part that is attributable to the deep personal animosity between the parents, which appears to have been a substantial impediment to the father's attempts to establish a meaningful visitation schedule with Tiffany.

However, the father's petition for visitation in 1985 rebuts any suggestion that he intended to abandon his daughter as the test in *Cline* demands. Rather, it demonstrates his desire to renew and foster a relationship with the child. We find no indication in either Section 1101(1) or 1103(3) that a prior legal abandonment operates in perpetuity despite later efforts by a parent to establish a familial relationship.

■ Furthermore, the Family Court's other findings are inconsistent with the notion of a present continuing abandonment of Tiffany. Although the mother petitioned to terminate Black's rights under § 1103(5)(b)(2), the trial court was unable to find that termination was warranted on those grounds. For the mother to succeed under § 1103(5)(b)(2) she was required to prove by clear and convincing evidence that the father was "incapable of exercising parental responsibilities, *and* that there appears to be little likelihood [he] will be able to exercise such parental responsibilities in the foreseeable future." 13 *Del.C.* § 1103(5)(b)(2) (1981). Given this record of the father's now well-established responsible lifestyle, and his clear intent to fulfill his parental responsibilities *before* the mother sought to terminate his rights, the trial court could not make the statutory findings mandated by § 1103(5)(b)(2), and did not do so. Indeed, the trial judge was "convinced that Mr. [Black] is now capable

of exercising such parental responsibilities." In the circumstances of this case, that finding is inconsistent with a present continuing abandonment of Tiffany.

### III.

■ The Family Court's application of the second component of the *Daber* termination test, the best interests of the child, was erroneous. Once the requirements for termination of parental rights under § 1103 have been met, the court must determine whether the termination would serve the best interests of the child. *Daber*, 470 A.2d at 728. In making this decision we are guided by 13 *Del.C.* § 722(a),[3] the statutory criteria for determining custody. *In re Three Minor Children*, Del.Supr., 406 A.2d 14, 19 (1979); *Daber*, 470 A.2d at 726–27; *In re Burns*, Del.Supr., 519 A.2d 638, 643 (1986). However, we do not apply an inflexible rule; rather we consider "the facts in the context in which the petition is presented." *Three Minor Children*, 406 A.2d at 19.

■ The expert testimony at trial did not support the court's finding that the termination of Black's rights would be in the best interests of Tiffany. The court based its findings upon testimony by Dr. Rosalind Kingsley, a licensed psychologist, who testified that, although Tiffany was well-adjusted and enjoyed a healthy relationship with her stepfather, it would be confusing and emotionally damaging to Tiffany's development if her natural father were introduced into her life at the present time. Significantly, Dr. Kingsley considered it important to Tiffany's future development for her to know her father. Dr. Kingsley estimated that the introduction should be made between the ages of 12 and 18. Ab-

---

3. § 722. Best interests of the child.

   (a) The Court shall determine custody in accordance with the best interests of the child. In determining the best interests of the child, the Court shall consider all relevant factors including:

   (1) The wishes of the child's parent or parents as to his custody;

   (2) The wishes of the child as to his custodian;

   (3) The interaction and interrelationship of the child with his parent or parents, his sib-

lings and any other person who may significantly affect the child's best interests;

   (4) The child's adjustment to his home, school and community; and

   (5) The mental and physical health of all individuals involved.

   (b) The Court shall not presume that a parent, because of his or her sex, is better qualified than the other parent to act as custodian for a child, nor shall it consider conduct of a proposed custodian that does not affect his relationship to the child.

sent from Dr. Kingsley's report are any comments concerning Tiffany's father, evidently the result of Dr. Kingsley's failure to interview him. On the other hand, as part of the visitation proceedings, Dr. Gelof, a licensed clinical psychologist, did interview both Tiffany and her parents, in addition to reviewing Dr. Kingsley's test. Contrary to Dr. Kingsley's finding, Dr. Gelof concluded that it would not hurt Tiffany's development to have a relationship with her natural father at the present time since he found both parents to be "decent people". Despite Dr. Kingsley's view that Tiffany should eventually establish a relationship with her father, and Dr. Gelof's conclusion that an immediate relationship would not be detrimental, the Family Court ordered termination.

The termination of a parent's rights is a drastic, final measure to be invoked only for the most compelling reasons. *Daber*, 470 A.2d at 726. Here, the trial court's finding that termination was in Tiffany's best interest is inconsistent with its other finding that the father is now sufficiently capable of exercising his parental responsibilities, and with the total absence of a finding that he will be unable to exercise such parental responsibilities in the foreseeable future. *See* 13 *Del.C.* § 1103(5)(b)(2) (1981). Above all, the findings are inconsistent with Dr. Kingsley's own testimony that a relationship should be fostered between Tiffany and her father at a later date. That evidence hardly supports the drastic legal effect of a termination order, which is that "all of the rights, duties, privileges and obligations recognized by law between the person or persons whose parental rights are terminated and the child shall *forever thereafter* cease to exist as fully and to all intents and purposes as if the child and the person ...

whose parental rights have been terminated were and always had been *strangers.*" *See* 13 *Del.C.* § 1112 (1981) (emphases added).[4]

■ Perhaps in a more perfect world, where gradations of what is "better" are paramount, it would be preferable for Tiffany to know and love only one father. But that is not the world in which we live. Parental rights are sacred fundamental liberty interests which can be terminated only for the most compelling reasons consonant with that principle. *Daber*, 470 A.2d at 726; *In re Burns*, 519 A.2d at 645. Such reasons are not supported by clear and convincing evidence in this case.

Under the circumstances the Family Court's judgment, terminating the father's parental rights, must be REVERSED.

---

**4.** The full text of 13 *Del.C.* § 1112 (1981) provides:

§ 1112. Effect of termination of parental rights.

Upon the issuance of an order terminating the existing parental rights and transferring such parental rights to another person or organization, the effect of such order shall be that all of the rights, duties, privileges and obligations recognized by law between the person or persons whose parental rights are terminated and the child shall forever thereafter cease to exist as fully and to all intents and purposes as if the child and the person or persons whose parental rights have been terminated were and always had been strangers. The person or organization to whom said parental rights are transferred shall have custody and guardianship of the child but such custody and guardianship shall terminate automatically upon the entry of another order transferring parental rights or on an order of adoption.