**In re the Interest of PATRICK A.S., JR., a male child born 10/16/87,**

**CATHY D.S., Petitioner,**

v.

**PATRICK A.S., Respondent.**

No. 95–03–06T.

Family Court of Delaware, New Castle County.

Submitted: Nov. 14, 1995.
Decided: Dec. 13, 1995.

John H. Benge, Jr., of Allmond, Easturn & Benge, Wilmington, for Petitioner.

Linda Shopland, of Biggs & Battaglia, Wilmington, for Respondent.

BUCKWORTH, Judge.

## TESTIMONIAL EVIDENCE

This is the Court's decision on the petition filed by Cathy D. ("Mother") (formerly Cathy S.) to terminate Patrick S.'s ("Father's") parental rights. Mother and Father were married in November 1986, and the child at issue, Patrick S., Jr., was born on October 16, 1987. The parties separated in November 1990, and divorced on October 15, 1991. Mother testified that the problems which eventually led to their divorce emerged after she became pregnant with Patrick. Mother asserts, and Father does not deny, that the breakup was due largely to Father's problems with alcohol which, among other things, caused him to disappear for days at a time. Mother testified that Father tried several times to stop drinking, and at one point was able to do so for six weeks. However, despite her pleading and her threats, Father was unable to permanently break his addiction. This situation culminated in Mother asking Father to leave in November 1990. The parties have not lived together since that time, and Mother remarried in June 1995. Father agrees that Patrick has a good life with Mother and his stepfather, Douglas D. Mr. D. would like to adopt Patrick. Testimony from Mother and Mr. D. indicates that Patrick believes he would like for Mr. D. to adopt him.

After the parties' divorce, Father had visitation with Patrick every Wednesday and every other weekend. The parties agree that approximately two years after the divorce, Father's visitation with Patrick began to lessen. The amount of time Father was spending with Patrick continued to dwindle until their last visit in April 1994. More specifically, Mother testified that Father saw Patrick only three or four times during Summer 1993, three times during Fall 1993, and twice between January and April 1994. Mother testified and Father confirmed that, at the same time that visitation between Father and Patrick was lessening, Father's contact with Patrick was erratic, and Father would often schedule visits with Patrick and then not show up or call. Mother and Mr. D. also testified that they often had difficulty determining what to tell Patrick in those situations, as Patrick was extremely hurt and disappointed when Father failed to show up for a scheduled visit.

Mother began to notice changes in Patrick's behavior as his time with Father lessened, and as his scheduled visits became sources of disappointment. She stated that Patrick behaved poorly when he returned from his visits with his father, and seemed very angry. In 1993, Patrick's teacher told Mother that Patrick, who had always been a

well-behaved child, was being very nasty to the other children. Mother testified that when she spoke with Patrick about his visits with his father, Patrick would say that his father had not spent any time with him, and had just put him in front of the television while he went to the bar.

These erratic, infrequent, and often disappointing scheduled visits ended in May 1994. At that time, Father scheduled a weekend camping trip with Patrick. Mother and Mr. D. testified that Patrick looked forward to that weekend with his Father, and enjoyed helping Mother pack his things. Unfortunately, Father did not show up for the camping trip, and Mother and Mr. D. were again left to console a hurt and disappointed Patrick. That was the last visit Father scheduled with Patrick, and Father has not spoken with Mother to request visitation since that time. Father testified that he *believes* he left messages regarding visitation with Patrick on Mother's answering machine three times since that May 1994 weekend, but he could not say when he had made the calls, or what messages he had left. Mother and Mr. D. deny receiving any such messages, and testified that they would not have tried to keep Father away from Patrick. The only contact which Father and Patrick have had since that May 1994 weekend was around Christmas 1994, when Father stopped by his parents' house after finding out that Patrick was visiting with them. This was not a scheduled visit, and Patrick was not expecting Father.

Mother and Mr. D. testified that, since the May 1994 incident, Patrick has not asked to call or see his father. Mother believes that Patrick decided he was tired of having his "heart hurt," which is how he told her he felt about his father's actions. Mother says she did not ask Patrick if he wanted to contact his father, because she was not sure how much more Patrick could take. Patrick has been doing better since that May 1994 incident, despite the fact that he has not seen or heard from Father. He is doing well in school, and has adjusted to his life with Mother and Mr. D. Patrick now calls Mr. D. "Dad," and they enjoy many activities together.

Father has not provided any form of child support since April 1994, when he lost his employment with United Manufacturers. Although Father has apparently had some form of employment since then, he claims he has only made enough money to provide for his needs.

Father agrees with virtually all of the facts described above. The only factual dispute is whether he left messages regarding visitation with Patrick on Mother's machine. The primary disagreement between the parties is over the application of the law to this case. Father argues that the requirements for a termination of his parental rights have not been met. He asserts that the problems he had with Patrick in the past were due to his alcoholism, which he claims he now has under control. Father testified that he has not had any alcohol since June 25, 1995, and that he has been attending AA meetings twice per week. Father says that he now sees things clearer, and that he does not want to lose his son. Therefore, while Father admits that he met the guidelines for a termination of his parental rights ("TPR") in the past, he claims that Mother has not proven that he meets them now.

Father requests that the Court deny Mother's petition, and give him the opportunity to be reintroduced into Patrick's life through joint counseling sessions. Father claims that he is willing to do whatever the Court finds necessary in order for him to retain his parental rights, and further testified that, if the counseling results in a finding that it is harmful to Patrick to continue his relationship with Father, he will agree to the termination of his rights.

Suzanne Schunk was called as an expert witness by Mother. Ms. Schunk has a Master's degree specializing in Family Mental Health, and has several licenses and certifications, including a Maryland Certified Clinical License and a Maryland Certified Social Work License. She is the CEO for Family Services of Cecil County, which is a private non-profit company that provides counseling and assessments on an affordable basis. Ms. Schunk interviewed Patrick twice, Mother and Mr. D. twice, and Father once, in order to perform a psychosocial assessment of the

parties. It was Ms. Schunk's opinion that Father's parental rights should be terminated, and that Patrick should be adopted by Mr. D.

Ms. Schunk reiterated what Mother and Mr. D. had testified to regarding Patrick's feelings for his father. She stated that Patrick told her that he was angry with his Father, that his Father ignored him and lied to him, and that he could not remember the last time he saw his Father, but what he did remember of it was his father drinking. Ms. Schunk testified that during her meeting with Father, she found it odd that, although Father knew that she had seen and spoken with Patrick, he never asked how Patrick was, nor did he indicate any plan for or ask any questions about improving his relationship with Patrick. She was also surprised by a statement by Father that, even if he never saw Patrick again, he just wanted to know that Patrick was "his". Ms. Schunk also testified that Father was tearful when they spoke of Patrick, and that he showed remorse for how things had worked out.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

■ Mother's petition for Termination of Parental Rights was filed on the ground of abandonment under 13 Del.C. § 1103(a)(2)[1], which is defined in 13 Del.C. § 1101.[2] According to the statute, abandonment occurs when a parent or someone holding parental rights, for a period in excess of six months, fails to provide any regular and reasonable financial help and fails to initiate substantial contacts with respect to a child.

The facts as set forth above clearly indicate that the statutory grounds have been met in regards to a finding by the Court that abandonment has occurred. At the time of the filing of the petition, Father had not had substantial contact with Patrick for almost

one year, nor had he paid any support whatsoever for Patrick during that same time period.

■ Having shown proof of the explicit statutory elements, the petitioner in a TPR case must then show proof of intent on the part of the respondent to forego all parental duties along with relinquishment of all parental rights, and proof that the termination of parental rights is in the best interest of the child. *Division of Social Services v. Tusiki,* Del.Fam., 446 A.2d 1109 (1982). The Court must also find a "settled purpose" on the parent's part to abandon the child and surrender all further claims to the child. *Cline v. Hartzler,* Del.Supr., 227 A.2d 210, 212 (1967). That purpose must reflect a present and continuing intent to abandon up to the time the termination proceedings are filed. In determining such intent the Court must consider not only subjective intent, but conduct as well. *Cline,* 227 A.2d 210, 212; *Tusiki,* 446 A.2d 1109, 1111.

■ Father admits that he failed to establish substantial contact with his son for a period of time in excess of six months, and that he did not provide any financial support during that same time period. However, he claims that those facts alone should not result in the termination of his parental rights, as the second part of the test, regarding his intent to abandon, has not been satisfied. Father blames his lack of contact and failure to pay support on his disease, claiming that he was unable to formulate a state of mind in which he was cognizant of his responsibilities toward his child.

Father argues that he did not have the intent to abandon his child, as his alcoholism prevented him from consciously forming an intent to abandon, or establishing a "settled purpose" to abandon his child and surrender all further parental claims. Father also argues that his efforts to quit drinking, as evidenced by his sobriety from June 1995 up

---

**1.** The procedure for termination of parental rights for the purpose of adoption ... may be initiated whenever it appears to be in the child's best interest and that 1 or more of the following grounds exist: ... (2) The child has been abandoned.

**2.** "Abandoned" shall be interpreted as referring to any child who, for a period of 6 months, ... has not received any regular and reasonable financial help from his parent or parents ... and on whose behalf no substantial contacts have been initiated by his parent or parents during that period.

to the time of trial, are proof of the fact that he does not have a present and continuing intent to forego and surrender all further parental claims to his son.

Father mistakenly places emphasis on the case of *J.B. v. The Division of Social Services,* Del.Supr., 460 A.2d 528 (1983) to support his position. However, that case was decided on the grounds of inability or failure to plan, and not on the ground of abandonment. More on point is the case of *Black v. Gray,* Del.Supr., 540 A.2d 431 (1988), wherein the Supreme Court of Delaware reversed a Family Court order terminating the respondent's parental rights. The Supreme Court found that, although a prior abandonment as defined by 13 *Del.C.* § 1101(1) had occurred, at the time of trial the facts of the case did not meet the test of *Cline.* The facts of the *Black* case were very similar to those of the instant case, in that the respondent had an abusive alcohol condition which led to the disintegration of his marriage and ultimately had an adverse affect on his relationship with his child.

One significant factual distinction between *Gray* and the present case is that the respondent in *Gray* had filed a petition for visitation prior to the TPR petition being filed. The Court determined that the act of filing for visitation rebutted any suggestion that the respondent intended to abandon his daughter as the test in *Cline* commands. *Gray,* 540 A.2d 431, 434. The Court concluded that the respondent's act demonstrated a desire on his part to renew and foster his relationship with the child. While the respondent's actions in *Gray* distinguish that case from the present case, as Father has yet to file any petition for visitation, Father did file an answer contesting the TPR petition, and testified that he has been sober since June of this

year as a direct result of the TPR petition being filed. Such actions by Father indicate a desire to turn his life around, which was the basis for the Court's holding in *Gray.*

The Court finds even more probative the *Gray* Court's finding that there is "no indication in either section 1101(1) or 1103(3) that prior legal abandonment operates in perpetuity despite later efforts by a parent to establish a familial relationship." *Gray,* 540 A.2d 431, 434. It is clear to the Court that since June 1995, Father has not had a continuing intent to abandon his child. The question, therefore, is whether Father's actions of becoming sober, after the filing of the petition, are substantial enough to rebut a finding that he has intentionally elected to forego all parental responsibilities. The Court finds that Father's actions are substantial enough to rebut such a finding, and therefore there is no intent to forego his parental responsibilities.

■ Even if Father's actions show an intent to forego his parental responsibilities, the petition must fail under the final test for TPR of whether such action is in the best interest of the child. *Daber v. the Division of Child Protective Services,* Del.Supr., 470 A.2d 723 (1983). In order to make this decision, the Court is guided by 13 *Del.C.* § 722(a).[3]

Unfortunately, the Court did not have expert testimony as to the possible psychological effects on the child of granting or denying the petition. Mother argues that the termination would benefit the child by giving him closure on this painful part of his life. She stresses that Patrick is thriving in his present home with her and Mr. D., and that they are a happy family unit and enjoy doing many activities as a family, with the minor

---

**3.** § 722. Best interests of child.
(a) The Court shall determine the legal custody and residential arrangements for a child in accordance with the best interests of the child, the Court shall consider all relevant factors including: (1) The wishes of the child's parent or parents as to his or her custody and residential arrangements; (2) The wishes of the child as to his or her custodian(s) and residential arrangements; (3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in

the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests; (4) The child's adjustment to his or her home, school and community; (5) The mental and physical health of all individuals involved; (6) Past and present compliance by both parents with their rights and responsibilities to their child under S701 of this title; and (7) Evidence of domestic violence as provided for in Chapter 7A of this title.

child even calling Mr. D. "Dad". On the other hand, Father argues that it would not be in the child's best interest to terminate his parental rights, as doing so would result in Patrick growing up believing that his father was unloving, uncaring, an alcoholic, and a liar, and that his father ultimately abandoned him for his own selfish interest.

An analysis of the Section 722 standards follows. Subsection (a)(1) of Section 722 looks at the wishes of the child's parents. In this case, the wishes of the parents negate each other, as Mother wishes for the TPR to occur, while Father opposes such action.

Subsection (a)(2) deals with the wishes of the minor child. In this case, Patrick's wishes appear to be those that were reflected and presented by Ms. Schunk, the Social report's scrivener, which are that he wants to be adopted. However, given the age of the minor child, who recently turned eight, the Court does not place great weight on this factor. Patrick is very hurt and angry, and cannot possibly be expected to understand the long-term effects of a termination of his father's parental rights.

Subsection (a)(3) considers the interaction and interrelationship of the child with his parents, stepparents, and other persons who may significantly affect his best interests. Patrick's interaction and interrelationship with Mother, as his primary caretaker over the years and his sole parental caretaker over the last year and a half, is excellent. Additionally, the relationship established by Patrick and his stepfather significantly affects Patrick positively.

As for Patrick's relationship with Father, clearly there has been serious damage to the relationship as a result of Father's actions. However, as Mother's testimony confirms, Patrick thought the world of his father until approximately two years ago when, according to Father, the alcohol completely took over his life. Additionally, the parties acknowledge that, even subsequent to Father's lack of contact with the child beginning in April 1994, Patrick continued to have contact with Father's family. A termination of Father's parental rights would in all likelihood cause such contacts to cease.

Having established the facts above, the Court has some difficulty applying this factor. Clearly Patrick's relationship with his Mother and Mr. D. is much better than his virtually non-existent relationship with his Father. However, the Court is not determining custody, and therefore a comparison of Patrick's relationship with his mother to that with his father is not helpful.

■ When considering a child's best interests for a TPR case, the Court is to be guided by the Section 722 factors. However, the inquiry "necessarily depends upon the facts in the context in which the petition is presented," *Daber v. Division of Child Protective Serv.*, Del.Supr., 470 A.2d 723 (1983), and no inflexible rules are to apply to the application of the factors. *In re Roxanne P.*, Del.Fam., 92–01–04T, Wakefield, J., 1992 WL 361394 (Sept. 15, 1992); *Daber*, 470 A.2d 723.

In the context of this case, the Court notes that even if the TPR is denied, the relationship which Patrick has with Mother and his stepfather will not diminish. Therefore, the real question under this factor is whether Patrick's relationship with Father and Father's family points to termination. Because of the relationship which Patrick once had with his father, the Court believes that, if it were to permit Father to re-establish contact with Patrick, their relationship would improve significantly. The Court also believes that termination would harm Patrick's relationship with the rest of Father's family. Therefore, the Court finds that this factor favors non-termination.

Subsection (a)(4) considers the child's adjustment to his home, school and community. As stated above, Patrick's adjustment to his new home and his stepfather has been excellent. Again, however, the Court notes that this situation will not change regardless of whether or not the TPR is granted. Therefore, this factor does not favor termination or non-termination.

Subsection (a)(5) looks at the mental and physical health of all individuals involved. Very little evidence was presented as to the parties' mental and physical health, aside from the prior alcohol abuse by Father. It is clear that Father had a relationship with

Patrick prior to his involvement with alcohol, and that the relationship deteriorated as a result of alcoholism. The Court can only conclude that it would be a disservice to the child to leave him with his only memories of Father being that he was uncaring, unloving, and preferred drinking over interacting with him, especially since the Court heard uncontradicted testimony that Father is no longer drinking, and is willing to attend counseling and do whatever is necessary to become a part of Patrick's life. Therefore, the mental and physical health of the individuals involved favors non-termination of Father's parental rights.

Subsection (a)(6), which considers the parents' compliance with their rights and responsibilities to the child, favors termination, as Father has clearly not met his obligations under Section 701 of Title 13.

Finally, under subsection (a)(7), there was no evidence presented in regards to the issue of domestic violence.

A review of the Section 722 factors shows that neither termination nor non-termination is strongly favored. However, the Court places greater weight on the child's mental and emotional well being than it does on the other factors, and this factor favors non-termination.

■ The Court also notes that termination of a parent's rights is a drastic, final measure, to be invoked only for the most compelling reasons. The Court questions how, if Father is now sober and able to exercise his parental rights in a fashion that would foster and rekindle a relationship with the child, it could be in Patrick's best interest to grant the TPR with the effect that "all the rights, duties, privileges and obligations recognized by law between the person ... whose parental rights are terminated and the child shall *forever thereafter* cease to exist as fully and to all intents and purposes as if the child and the person ... whose parental rights have been terminated were and always had been '*strangers.*'" *Gray*, 540 A.2d 431, 435 (1988) (emphasis added).

That is not to say that Father will not return to drinking; however, it appears that Father has been sober since June 1995, and if he stays that way he could reestablish ties with his son and provide a substantial and significant relationship for the child. At the same time, the child would continue to enjoy the relationship he has with Mr. D., as it is clear that relationship has had a positive effect on the child. The Court certainly commends Mother for her caretaking responsibilities, which she has carried out without assistance from Father over the past year and a half, and to Mr. D., for providing the male role model for Patrick that was clearly missing from his life. However, in the end the Court must enter a finding that the termination of Father's parental rights would not be in Patrick's best interests. This finding, coupled with the prior finding that there has not been a settled purpose to abandon by Father, leaves this Court no alternative but to deny the petition.

The Court hereby instructs the parties to correspond as to how visitation can best be achieved. However, the Court will not address that issue in this pending termination petition. Father must take steps to properly petition the Court for that relief. It is minimally anticipated that the initial visitation should be arranged through a mutually agreed upon counselor, at Father's expense, and should be supervised by that counselor until such time as the counselor recommends unsupervised visitation, or, in the alternative, recommends no further contact between Father and Patrick. Should the latter occur, the Court will allow the parties to reopen this termination petition, taking Father at his word that he will abide by that recommendation and consent to the termination. The window for reopening the present petition shall be no longer than one year from today's date. That provides sufficient time to have a counselor form an informed opinion as to *whether the termination should occur.*

**IT IS SO ORDERED.**