**Nicholas D. BARR, Respondent Below, Appellant,**

v.

**DIVISION OF FAMILY SERVICES** and Casa, Petitioner Below, Appellee.

No. 538, 2008.

Supreme Court of Delaware.

Submitted: May 21, 2009.
Decided: June 1, 2009.

Noel E. Primos, Esquire, Schmittinger & Rodriguez, P.A., Dover, Delaware, for appellant.

Donna Thompson, Esquire, Department of Justice, Dover, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND and RIDGELY, Justices.

HOLLAND, Justice.

The respondent-appellant, Nicholas D. Barr, appeals from the decision of the Family Court terminating his parental rights over his daughter, Nancy.[1] Barr raises three arguments on appeal. First, he contends that the Family Court erred in finding that he intentionally abandoned Nancy. Second, he contends that the Family Court erred in finding that he failed to plan for Nancy's physical needs and mental and emotional health and development. Third, he contends that the Family Court erred in finding that the termination of his parental rights was in the best interest of Nancy.

### Procedural History

Barr is the father of Nancy, who was born on December 11, 1999. After Nancy was born, she remained in the custody of her Mother. However, because the Mother was unable to gain stability in employment and housing, there was a history of Nancy being placed "with relatives and then returned back to the mother." On November 30, 2006, Nancy and her siblings entered the care and custody of the Division of Family Services ("DFS") due to the Mother being homeless. Barr was incarcerated at that time.

When Nancy first entered DFS custody, she was residing with a relative of her

---

1. Pseudonyms were assigned on appeal pursuant to Del.Supr. Ct. R. 7(d).

sibling. The Mother placed Nancy with the relative in an attempt to prevent her from entering foster care. Nancy remained with the relative until being placed in a foster home on July 25, 2007. Nancy was still in the foster home at the time of the termination of parental rights ("TPR") hearing.

On December 11, 2007, the Family Court held a permanency hearing. At that time, neither Barr nor the Mother had completed their case plans for reunification with their daughter. Therefore, the permanency goal for Nancy was changed from reunification to termination of parental rights. On January 11, 2008, DFS filed a petition for the termination and transfer of parental rights with regard to Barr and the Mother. A hearing on the petition was scheduled for August.

On August 7, 2008, the Family Court held a hearing on DFS's petition to terminate Barr's parental rights. At the hearing, Barr was unable to produce proof of completing any aspect of his case plan. Barr claimed to have completed "a substance abuse evaluation through probation and parole." He did not, however, provide any proof of such completion to DFS. Barr also failed to provide financial support for Nancy since she entered DFS custody. Barr testified at the hearing and did not dispute having a history of domestic violence with the Mother or having a history of substance abuse.

By order dated September 29, 2008, the Family Court terminated the parental rights of Barr.[2] The court concluded that Barr had "failed to plan adequately for the physical needs and the mental and emotional health and development of [Nancy]" in the following ways: (1) Nancy has been in the care of the Division for more than one year; (2) there is a history of neglect, abuse and lack of care by Barr; (3) Barr is not willing or able to promptly reassume care of Nancy and pay for her care; and (4) failure to terminate the rights of Barr in Nancy will result in continued emotional instability and physical risk. Additionally, the court found that Barr "has intentionally abandoned [Nancy]." This appeal followed.

### Barr's Criminal History

Barr has an extensive criminal history of twenty-five reported felonies with five convictions, including Kidnapping in the Second Degree, Escape after Conviction and Attempt to Commit a Class C Felony; and sixty-six reported misdemeanors with thirty-eight convictions, including "a variety of assault thirds," Unlawful Imprisonment in the Second Degree, Escape in the Third Degree and Possession With Intent to Deliver Cocaine. He has also been convicted twice for violation of parole violations. As a result of these convictions, Barr was incarcerated for most of his daughter's life, including the time she was brought into DFS custody in November 2006 until October 2007, and again from January 2008 until April 2008. In addition, at the time of the August 2008 TPR hearing, Barr was again incarcerated, pending trial on numerous new charges.

During his most recent probation, Barr "was moved from a lower level of supervision to a Level III case load for intensive supervision," because he was considered to have "medium high" risks and needs. On June 11, 2008, Barr was incarcerated for multiple criminal charges, which included: Assault in the First Degree, Possession of

---

2. *In re N.N.B.*, No. 08–01–3TK, at 20 (Del. Fam.Ct. Sept. 29, 2008) [hereinafter *TPR Order*]. The *TPR Order* also terminated the parental rights of the Mother as to Nancy, and terminated the parental rights of the Mother and the natural fathers as to two other children.

a Firearm During the Commission of a Felony, Possession of a Deadly Weapon by a Person Prohibited, Reckless Endangerment in the First Degree, and Criminal Mischief. Although he maintained his innocence of those charges at the TPR hearing and was released shortly after the Family Court issued its decision, he remained incarcerated for those pending charges at the time of the TPR hearing and was thus unable to promptly assume custody of Nancy.

### Barr's Interaction With DFS

Barr first came to the attention of DFS in 1998, when DFS discovered domestic violence between Barr and the Mother during an investigation regarding a sibling of Nancy. The Mother informed DFS that she had to be hospitalized because of a physical assault by Barr and that Barr had been drinking and possibly using drugs at the time of the incident. Barr was later incarcerated for the assault of the Mother.

On June 9, 1999, when the Mother was pregnant with Nancy, Barr "became belligerent" while informing DFS he had no intention of case planning to be reunified with Nancy once she was born. On June 23, 1999, the Mother told DFS that Barr "had gotten 'out of control'" with her and she had to call the police. According to the Mother, Barr was subsequently arrested and a no contact order was put in place between them once he was released on bail.

On October 9, 2007, Barr signed a case plan for reunification with his daughter, in anticipation of his pending release from prison. The case plan required that Barr complete the following elements: obtain stable housing; obtain stable employment; comply with probation requirements and incur no new criminal charges; complete a parenting class; work with a parent aide; undergo a substance abuse evaluation and complete any recommended treatment; and undergo a domestic violence and anger management evaluation and complete any recommended treatment. The domestic violence requirement was based on the history of domestic violence between Barr and the Mother.

Barr was released from incarceration on October 10, 2007. He called his DFS worker on October 15 and informed her that he would meet with her at the DFS office "within a couple of days." Barr never appeared for the meeting. Barr explained at the August 2008 TPR hearing that the scheduled meeting with DFS conflicted with an appointment with his probation officer and he called to reschedule the appointment with DFS, but no one called him back. DFS claims that it was unsuccessful in its attempts to contact Barr at any of his listed numbers. As a result, the meeting was never rescheduled. There was no contact between Barr and DFS from October 2007 to May 2008, and DFS was unaware of his whereabouts. During that time, Barr moved to Richmond, Virginia, where he was incarcerated from January 2008 to April 2008.

Barr did not contact DFS again until he called DFS on May 12, 2008. During that phone call, the DFS worker discussed the elements of the case plan with Barr and informed him that "it would be his obligation to make sure he met ... the goals of his case prior to" the August 2008 TPR hearing. Barr was informed he would have to complete the elements of his case plan independently because the goal for Nancy had already been changed to termination of parental rights at the December 2007 permanency hearing for which he failed to appear. Barr had no further contact with DFS between the May 2008 phone call and the August 2008 TPR hearing.

### Barr's Interaction With Nancy

While incarcerated in 2005, Barr spoke with Nancy every day on the telephone and wrote her letters from prison telling her that he loved her and to keep up her good work in school. This contact stopped in late 2006 and DFS claims that Barr has had no contact with his daughter since. Barr claims that he corresponded with Nancy while she was placed in the home of relatives in May 2007. But this contact, if it occurred, was not supervised by DFS and DFS had no knowledge of it. Moreover, Barr did not have "the slightest idea" why Nancy was living with the relative or how long she was there. DFS claims that if Barr had case planned and maintained contact with DFS, Barr would have had weekly supervised visits with his daughter.

### Nancy's Health

On August 12, 2007, Nancy participated in a parent competency evaluation of her Mother, performed by Dr. Donna Lentine. Dr. Lentine determined that Nancy "display[ed] attachment related difficulty" and that it is "very important that [Nancy is] . . . provided stable and consistent caretaking." Dr. Lentine further indicated that "the risk of instability should be weighed heavily against potential benefits of reunification."

Nancy was also involved in counseling to address her abandonment, separation and loss, and anger issues. Based on the history of lack of stability and consistency in her life, Nancy was "struggling for some type of nurturance and some type of atten-

tion." Nancy knew Barr's name, but did not have a relationship with him. She was "a very angry little girl" who had a lot of questions regarding why Barr had "never been a part of her life." Nancy did not understand why Barr did not call or contact her, especially when he was "out of prison." The possibility of adoption had been explained to Nancy and she was "eager" for the DFS worker "to find her a family" with the characteristics she desired.

### Standard Of Review

■ When reviewing the Family Court's termination of parental rights, our standard and scope of review involves a review of the facts and law, as well as the inferences and deductions made by the trial court.[3] To the extent that the issues on appeal implicate rulings of law, we conduct a de novo review.[4] To the extent that the issues on appeal implicate rulings of fact, we conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by the record and are not clearly wrong.[5] This Court will not disturb inferences and deductions that are supported by the record and that are the product of an orderly and logical deductive process.[6] If the trial court has correctly applied the pertinent law, our review is limited to abuse of discretion.[7]

■ In Delaware, the trial judge must conduct a two-step analysis when making

3. Powell v. Dep't of Serv. for Children, Youth & their Families, 963 A.2d 724, 730 (Del.2008) (citing Solis v. Tea, 468 A.2d 1276, 1279 (Del. 1983)).

4. Powell v. Dep't of Serv. for Children, Youth & their Families, 963 A.2d at 730–31 (citing In re Heller, 669 A.2d 25, 29 (Del.1995); Black v. Gray, 540 A.2d 431, 432 (Del.1988)).

5. Id. at 731 (citing In re Stevens, 652 A.2d 18, 23 (Del.1995)).

6. Id. (citing In re Stevens, 652 A.2d at 23; Solis v. Tea, 468 A.2d at 1279).

7. Id. (citing Solis v. Tea, 468 A.2d at 1279).

the decision to terminate parental rights.[8] First, the trial judge determines whether there is clear and convincing proof of at least one of the grounds for termination enumerated in title 13, section 1103 of the Delaware Code, which include abandonment of the child and failure to plan, and at least one of the enumerated conditions for termination exists.[9] Second, the trial judge must determine whether the decision is in the best interest of the child as that term is defined in title 13, section 722 of the Delaware Code.[10] Both of these steps must be established by clear and convincing evidence.[11]

### Record Supports Abandonment

■ The Family Court found that Barr abandoned Nancy pursuant to title 13, section 1103(a)(2). Barr contends that the court clearly erred in this determination by erroneously finding that Barr: (1) did not communicate or visit regularly with his daughter; (2) failed to manifest the ability and willingness to assume legal and physical custody of her; and (3) had a present and continuing intent to abandon Nancy up to the time that termination proceedings were filed.

■ Pursuant to section 1103(a)(2), intentional abandonment occurs if the parent has failed to: (A) "[c]ommunicate or visit regularly with the minor" and (B) "[m]anifest an ability and willingness to assume legal and physical custody of the minor, if, during this time, the minor was not in the physical custody of the other parent," for a period of at least six consecutive months before the termination petition is filed.[12] In addition, in order to determine that intentional abandonment has occurred, the court must find a "settled purpose" by the parent to abandon the child and surrender any further parental claims to the child.[13] A "settled purpose" is shown through "a present continuing intent to abandon up to the time the termination proceedings were filed."[14] The court must observe both the subjective and objective intent of the parent, with the objective intent measured by the parent's conduct.[15] This finding must be supported by clear and convincing evidence.[16]

The Family Court found that Barr "did not communicate and visit regularly" with Nancy for at least six consecutive months in the year preceding the filing of the TPR petition. The TPR petition was filed on January 11, 2008. Therefore, the relevant period of time is January 2007 to January 2008.

It is undisputed that Barr did not communicate with Nancy after May 2007.

---

8. Del.Code Ann. tit. 13, § 1103(a) (2008); *Powell v. Dep't of Serv. for Children, Youth & their Families*, 963 A.2d at 731; *Div. of Fam. Servs. v. Hutton*, 765 A.2d 1267, 1271 (Del. 2001); *Daber v. Div. of Child Protective Serv.*, 470 A.2d 723, 726 (Del.1983).

9. *See* Del.Code Ann. tit. 13, § 1103(a)(1)-(8); *Powell v. Dep't of Serv. for Children, Youth & their Families*, 963 A.2d at 731; *Div. of Fam. Servs. v. Hutton*, 765 A.2d at 1272.

10. *See* Del.Code Ann. tit. 13, § 722.

11. *Powell v. Dep't of Serv. for Children, Youth & their Families*, 963 A.2d at 731 (citing *In re Stevens*, 652 A.2d at 23).

12. Del.Code Ann. tit. 13, § 1103(a)(2)(a.)(2.).

13. *R. v. T.*, 799 A.2d 349, 359 (Del.Fam.Ct. 2002); *see In re Stevens*, 652 A.2d 18, 25 (Del.1995); *Black v. Gray*, 540 A.2d 431, 433 (Del.1988).

14. *Id.*

15. *Id.*

16. *P.A.F. v. J.R.F.*, 451 A.2d 830, 831 (Del. 1982).

Barr argues, however, that his failure to communicate with her during that period was through no fault of his own. He claims that when Nancy was transferred to a new foster family, DFS would not permit Barr to contact her.

Although Barr claims that he had contact with Nancy by letters and phone calls at some point between December 2006 and May 2007, such information was unknown by either DFS workers or the Children's Choice worker assigned to the case. There is no dispute, however, that Barr's last personal meeting with Nancy was in June 2006, during a thirteen-day period in the year he was not incarcerated, and his last contact with her of any kind was May 2007. Therefore, it is undisputed that Barr did not communicate with his daughter for eight months prior to the filing of the TPR petition.

Nancy was not placed in the foster home until July 25, 2007. Barr made no attempt to have contact with her between May 2007 and the time she was placed in the foster home. After Nancy was placed in the foster home, Barr would have been permitted visitation if he had been case planning with DFS for reunification—his case plan required weekly supervised visits with her. But, Barr failed to case plan and, by his own admission, never requested any such visitation. Accordingly, there is clear and convincing evidence that Barr did not communicate and visit regularly with his daughter for at least six consecutive months in the year preceding the filing of the TPR petition.

### Unwillingness To Assume Legal And Physical Control

The Family Court found that Barr "failed to 'manifest an ability and willingness to assume legal and physical custody of the minor'" for at least six consecutive months in the year preceding the filing of the TPR petition. The court noted that following Barr's release from prison in October 2007, he made initial contact with DFS, but never followed through and took no initiative to prepare to assume the legal and physical custody of Nancy. Barr argues that he set up an appointment with DFS to case plan immediately upon his release from incarceration in October 2007, but the scheduled meeting conflicted with an appointment with his probation officer. Barr called to reschedule the appointment with DFS, but no one called him back. He argues that when he next contacted DFS in May 2008, after the TPR proceedings had begun, the DFS worker told him that DFS "wouldn't be assisting him in reunification with his daughter."

Barr's repeated incarcerations have continuously interfered with his ability to care for Nancy. Barr was incarcerated from the time Nancy was brought into DFS custody in November 2006 until October 2007. He was also incarcerated in 2005 and again from January 2008 until April 2008. In addition, at the time of the TPR hearing, Barr was again incarcerated, pending trial on numerous new charges. In the three-month period between October 2007 and January 2008, in which Barr was not incarcerated, he made, at best, one attempt to contact DFS regarding his case. Barr's continual incarceration highlights his failure to be a consistent caretaker for Nancy and his inability to promptly assume custody of Nancy at the time of the TPR hearing. In addition, Barr's conduct in the brief period of time he was not incarcerated indicates that he was unwilling to exert any real effort to work with DFS on his case plan regarding Nancy. Accordingly, there is clear and convincing evidence that Barr failed to manifest an ability and willingness to assume legal and physical custody of the minor for at least six consecutive months in the year preceding the filing of the TPR petition.

### Continuing Intent To Abandon

 · The Family Court found that Barr had a "present continuing intent to abandon up to the time the termination proceedings were filed." The court noted that despite being intermittently around the Mother and Nancy for ten years, Barr "repeatedly indicated a complete lack of interest in parenting [Nancy]." Barr argues that the court improperly relied upon a hearsay statement in a Social Report prepared by DFS and admitted into evidence, that Barr stated in 1999 that "he would not be planning with the Division and that the mother would be on her own to plan with the agency." Barr asserts that while the alleged statement is an admission by a party-opponent, its recounting in the Social Report is hearsay because the evidence was not communicated by a witness at the TPR hearing. Barr further asserts that even if the statement is admissible, it merely indicates his intention as of 1999, and not as of 2007.

 " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." [17] Hearsay is not admissible except as provided by law or by the Delaware Uniform Rules of Evidence.[18] A statement offered against a party which is his own statement, is an admission by a party-opponent and is not hearsay.[19] In addition, "records, reports, statements or data compilations, in any form, of a public office or agency setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law" are not excluded by the rule against the admission of hearsay.[20] This exception does not apply to "investigative reports prepared by or for a government, a public office or an agency when offered by it in a case in which it is a party." [21]

In this case, the only objection to the Social Report at the hearing was that the report contained hearsay information, not that the report itself was inadmissible. The challenged statement was an admission by Barr at a 1999 meeting with DFS's Intensive Reunification Unit, in which he refused to plan with DFS, expressed his intent never to plan with DFS, and said that the Mother would have to plan with DFS on her own. The statement is offered against Barr and is his own statement. Therefore it is an admission by a party-opponent and is not hearsay.

This admissible statement was introduced at trial in the Social Report, which is prepared by the DFS permanency worker to summarize the case after reviewing the entire DFS record. The worker prepares the report pursuant to the mandates of title 13, section 1105(c) of the Delaware Code.[22] The report is produced at the end

17. Del. R. Evid. 801(c).

18. Del. R. Evid. 802.

19. Del. R. Evid. 801(d)(2)(A).

20. Del. R. Evid. 803(8).

21. Del. R. Evid. 803(8)(B).

22. Del.Code Ann. tit. 13, § 1105(c) ("In any case in which a petition for the termination of parental rights has been filed pursuant to § 1103(a)(1) of this title and the Department or a licensed agency is a party to the proceeding, there shall be attached to the petition a social report. In any case in which a petition for the termination of parental rights has been filed on any other ground set forth in § 1103(a) of this title and the Department or a licensed agency is a party to the proceeding, a social report shall be filed no later than 1 week prior to the date of the hearing on the petition.").

of the case when the goal has been changed to TPR and adoption. Therefore, the Social Report is admissible as an exception to the rule against hearsay. The statement is relevant as to Barr's intent to abandon because it indicates that Barr did not wish to case plan for Nancy in 1999. When considered with other evidence in this case, the evidence shows a pattern of unwillingness or inaction by Barr from 1999 until the August 2008 TPR hearing.

Barr also argues that his conduct demonstrates that he wanted to communicate with his daughter and only ceased doing so after May 2007 because DFS would not permit him to contact Nancy at her new foster home. Thus, he asserts that there was no clear and convincing evidence of a "present continuing intent" to abandon Nancy. The record reflects, however, that Barr made no attempt to have contact with Nancy while she was residing with a relative between May 2007 and the time she was placed in the foster home on July 25, 2007. After she was placed in the foster home, Barr would have been permitted visitation with her if he had been case planning with DFS for reunification with Nancy; however, Barr failed to do so. Accordingly, the record supports the Family Court's conclusion that Barr had a "present continuing intent" to abandon Nancy.

### *Failure To Plan*

■ Barr contends that the Family Court erred in determining that Barr failed to plan adequately for the physical needs and mental and emotional health and development of Nancy pursuant to title 13, section 1103(a)(5). Although Barr concedes that Nancy has been in DFS custody for at least one year, Barr contends that the court clearly erred in this determination by erroneously finding that:

(1) Barr had exhibited a "positive disinterest" in parenting her; (2) there had been a history of neglect, abuse and lack of care; (3) Barr is neither willing nor able promptly to resume care of her; (4) failure to terminate Barr's parental rights would result in continued emotional instability and physical risk to Nancy.

Pursuant to section 1103(a)(5)(a.), the Family Court may determine that the parental rights of a parent should be terminated if it finds that there is both an inability or failure "to plan adequately for the child's physical needs or mental and emotional health and development," and one or more enumerated conditions exist: (1) the child has been in the care of the DFS or licensed agency for a period of one year; (2) there is a history of neglect, abuse or lack of care of the child or other children by the parent; (3) the parent is incapable of discharging parental responsibilities due to extended or repeated incarceration; (4) the parent is not able or willing to assume promptly legal and physical custody of the child, and to pay for the child's support, in accordance with the parent's financial means; or (5) failure to terminate the relationship of the parent and child will result in continued emotional instability or physical risk to the child.[23]

The record reflects that Barr did not complete his DFS case plan which he signed on October 9, 2007. Once released from incarceration on October 10, Barr failed to meet with DFS, failed to appear at December 2007 permanency hearing, moved to Richmond, Virginia, and stopped all communication with DFS. The only other contact DFS had with Barr was in May 2008, after the goal for Nancy had already been changed from reunification to TPR and adoption. By the time of the August 2008 TPR hearing, Barr had failed to com-

**23.** Del.Code Ann. tit. 13, § 1103(a)(5)(a.).

plete any aspect of his case plan. During this time, Nancy was suffering from abandonment and anger issues and was confused and upset by the chronic lack of contact from Barr.

It is undisputed that Nancy was in DFS custody for more than one year. Accordingly, we need not address whether the remaining conditions under section 1103(a)(5) are satisfied because the statute only requires that the Family Court find one of the additional conditions are met. The factual findings of the trial judge that Barr failed to plan adequately for the physical needs and mental and emotional health and development of Nancy, and its conclusion that Barr's parental rights should be terminated, are supported by the record and not clearly erroneous.

### Best Interests Require Termination

■ In order to terminate a party's parental rights, the record in the Family Court must establish not only abandonment or failure to plan, but also that the termination is in the best interest of the

child.[24] Under the best interest standard, there must be "clear and convincing evidence that termination of parental rights is essential to the child's welfare."[25] The factors enumerated in title 13, section 722(a) govern the court's best interest determination in a termination of parental rights proceeding.[26]

■ This Court has held that, while all of the factors in section 722 must be considered by the court, when balancing the relevant factors, the Family Court may give different weight to different factors.[27] "The amount of weight given to one factor or combination of factors will be different in any given proceeding. It is quite possible that the weight of one factor will counterbalance the combined weight of all other factors and be outcome-determinative in some situations."[28]

Barr contends that the Family Court committed clear error in determining that termination of Barr's parental rights would be in the best interests of Nancy. Barr argues that there is not clear and convinc-

---

24. Del.Code Ann. tit. 13, § 1103(a).

25. *Powell v. Dep't of Serv. for Children, Youth & their Families*, 963 A.2d at 733 (quoting *Div. of Fam. Servs. v. Hutton*, 765 A.2d at 1272).

26. *Id.* (citing *In re Hanks*, 553 A.2d 1171, 1179 (Del.1989)). Title 13, section 722(a) provides that in determining the best interests of the child, the court shall consider all relevant factors, including:

(1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;
(2) The wishes of the child as to his or her custodian(s) and residential arrangements;
(3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;

(4) The child's adjustment to his or her home, school and community;
(5) The mental and physical health of all individuals involved;
(6) Past and present compliance by both parents with their rights and responsibilities to their child under § 701 of this title;
(7) Evidence of domestic violence as provided for in Chapter 7A of this title; and
(8) The criminal history of any party or any other resident of the household including whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense. Del.Code Ann. tit. 13, § 722(a)(1)-(8).

27. *Powell v. Dep't of Serv. for Children, Youth & their Families*, 963 A.2d at 735 (citing *Snow v. Richards*, 2007 WL 3262149, at *3 (Del. Supr); *Fisher v. Fisher*, 691 A.2d 619, 623 (Del.1997)).

28. *Id.* (quoting *Fisher v. Fisher*, 691 A.2d at 623).

ing evidence in the record to support a number of the factors and, in fact, there is no evidence in the record with regard to the interests of Nancy. This claim is without merit as the Family Court properly considered each of the factors in section 722.

First, the Family Court considered the wishes of the child's parents.[29] The court correctly stated that Barr was opposed to the granting of the TPR petition. The court also stated that Barr did not wish for Nancy to be placed in his care. This finding is supported by Barr's failure to case plan for reunification with his daughter. Once released from incarceration, Barr left the state of Delaware, never attempted to visit Nancy, and made no attempt to case plan with DFS for seven months. Although Barr claims that his attempts to case plan were thwarted by DFS, he made no effort to case plan until seven months after he was released from prison and three months before the TPR hearing. Even though he was reminded of the elements of his case plan and that he would have to complete these elements on his own, Barr failed to make any progress with his case plan or request to visit Nancy during the three months preceding the TPR hearing. At the time of the TPR hearing, Barr was incarcerated pending trial and was unable to provide a home for his daughter. Accordingly, there was clear and convincing evidence of a lack of care, contact and ability to provide for Nancy, which supports the finding of the Family Court that Barr did not want her to be placed in his care, even if he did not specifically so state.

The Family Court next considered the second factor, the child's wishes.[30] The court found that there was no evidence presented as to Nancy's wishes; however, the Court–Appointed Special Advocate supported the TPR petition. In *Powell v. Department of Services for Children, Youth and their Families,* there was no evidence presented as to the child's wishes because the child was too young to adequately express his opinion. There was also no evidence presented as to whether there was domestic violence. We found that this did not prevent the Family Court from considering those factors in a manner contemplated by section 722 and did not prevent the court from balancing the factors to determine the best interests of the child.[31]

Third, the trial judge considered the child's interaction with significant adults in her life, with other persons in the home and with other persons who may significantly affect her best interests.[32] The record indicates that Barr's repeated incarcerations over the course of Nancy's life prevented him from having contact with her. The record also indicates that when not incarcerated, Barr failed to arrange visitation with Nancy or show an interest in her life. Thus, the court found that Barr had failed to be a consistent part of Nancy's life. The court also noted that the Mother's parental rights were terminated. These findings are supported by the record.

The trial judge then considered the child's adjustment to her home, school and community under the fourth factor.[33] The court noted that, in contrast to the damaging instability she experienced in the cus-

---

29. Del.Code Ann. tit. 13, § 722(a)(1).

30. Del.Code Ann. tit. 13, § 722(a)(2).

31. *Powell v. Dep't of Serv. for Children, Youth & their Families,* 963 A.2d at 734–35.

32. Del.Code Ann. tit. 13, § 722(a)(3).

33. Del.Code Ann. tit. 13, § 722(a)(4).

tody of the Mother, Nancy had been in a foster home since July 25, 2007, and has remained in the same schools and the same community during that time. These findings are supported by the record.

The trial judge next considered the mental and physical health of all persons involved under the fifth factor.[34] The court noted that Nancy suffers from issues of anger, separation, loss and abandonment, and attends counseling for these issues. The court also found that the Mother suffers from Dysthymic Disorder (chronic depression) and Personality Disorder, and despite repeated domestic violence, continually lets Barr back into her life, thereby creating a situation dangerous to Nancy's mental and physical health. No evidence of Barr's physical or mental health was presented to the court. These findings are supported by the record.

Sixth, the trial judge considered the parents' past and present compliance with their rights and responsibilities to their child under title 13, section 701.[35] The court noted that Barr failed to ever make any payments for child support. These findings are supported by the record.

Under the seventh factor, the trial judge may consider any evidence of domestic violence.[36] Barr argues that there is no reliable evidence in the record to support the court's finding, other than the hearsay contained in the Social Report. As noted above, the statement contained in the Social Report is not hearsay. Accordingly, the court's finding of Barr's repeated instances of domestic violence, including a 1999 arrest after Barr assaulted the Mother, who was pregnant with Nancy at the time, are supported by the record.

Finally, the court considered Barr's extensive criminal history.[37] Barr has been convicted of five felonies, thirty-eight misdemeanors, and two violations of parole. These findings are supported by the record.

The Family Court properly considered each of the factors in section 722. The trial judge's conclusion that the termination of Barr's parental rights was in the best interests of Nancy is supported by the record. It is also the product of an orderly and logical deductive process.

### Conclusion

The judgment of the Family Court is affirmed.

---

34. Del.Code Ann. tit. 13, § 722(a)(5).

35. Del.Code Ann. tit. 13, § 722(a)(6).

36. Del.Code Ann. tit. 13, § 722(a)(7).

37. Del.Code Ann. tit. 13, § 722(a)(8).