v.

T., Respondent.

**In the Interest of J. (d.o.b. X/92)**

**File No. 01–03–06TN.
Petition No. 01–07650.**

Family Court of Delaware,
New Castle County.

March 14, 2002.

Mary C. Boudart, Doroshow, Pasquale, Krawitz, Siegel & Bhaya, Wilmington, for Petitioner.

Rebecca W. Tulloch, Delaware Volunteer Legal Services, Inc., Wilmington, for Respondent.

## DECISION REGARDING PETITION TO TERMINATE PARENTAL RIGHTS

COONIN, J.

This is the Court's decision on the Amended Petition for Termination and Transfer of Parental Rights filed by R. (hereinafter referred to as "Father") against T. (hereinafter referred to as "Mother") in regard to their daughter, J., (hereinafter referred to as "J.") born X 1992. A two day hearing was held on November 9 and November 14, 2001, followed by the submission of post-trial written closing arguments in December. Thereafter, counsel for both petitioner and respondent filed objections to each others closing arguments contending that each other's arguments contained facts not in evidence.

Father seeks Termination of Parental Rights of Mother in J. for the purpose of freeing the child for adoption by Father's current wife, D. (hereinafter referred to as "Stepmother"). Father alleges as grounds for the termination the intentional abandonment pursuant to 13 *Del.C.* § 1103(a)(2)a.2 or in the alternative, abandonment without intent, pursuant to 13 *Del.C.* § 1103(a)(2)b.2.

This is the Court's decision on the Petition to Terminate Parental Rights.

## I. PROCEDURAL HISTORY

Father and Mother married on February 5, 1993 approximately five months after the birth of their daughter, J., on X 1992. The parties separated a few months later during the summer of 1993. By consent Order of the parties dated February 15, 1994, Mother and Father agreed to have joint legal custody of J. with Father to be the primary residential parent and Mother to have visitation on alternating weekends as well as Wednesdays during the daytime. A Decree of Divorce was granted by this Court on February 16, 1995.

In March of 1995, Father petitioned to modify visitation as the result of Mother's alleged abandonment of J. as well as mother's then six year-old son by a former relationship, C. ("C."). An Interim Order was entered on April 3, 1995 restricting

Mother to supervised visitation with J. On April 12, 1995, an Order was entered by Judge Alison Whitmer Tumas of this Court requiring all visitation between Mother and J. to be supervised in light of Mother's drug dependency, limiting consideration of modification of visitation in the future until Mother completed a substance abuse evaluation. In February of 1996, the parties agreed to modify the April 12, 1995 Visitation Order, and a new Order was entered, now allowing unsupervised visitation of Daughter by Mother. Visitation was thereafter again limited by Stipulated Order on April 21, 1998, which provided that Father was to have sole custody of J. and that Mother's visitation with J. was to be supervised by Father "at least on a monthly basis." After learning that Father desired Mother to terminate her parental rights so J. could be adopted by Stepmother, Mother on October 16, 2000 filed in Sussex County (later transferred to New Castle County) a Petition to Modify Custody alleging that Father was refusing to provide her with visitation as called for in the July 21, 1998 Stipulated Order. Service over Father was never obtained as Mother did not provide the Court with Father's address and that matter was dismissed. Mother filed a new Petition to Modify Custody against Father on February 2, 2001, and on March 13, Mother filed a Petition–RTSC alleging that Father had been depriving Mother of visitation since February 21, 1999. That same day, March 13, 2001, Father filed his Petition for Termination and Transfer of Parental Rights of Mother in J., the Petition which is the subject of this litigation. Concurrent with the filing of Father's TPR Petition, Stepmother filed a Petition for Adoption of J.

Following a hearing on Mother's Petition–RTSC on May 14, 2001, Judge Tumas dismissed Mother's Petition–RTSC holding that "for at least two years following the entry of 1998 Order," Mother failed to exercise (or seek enforcement of) the visitation afforded her under the Order. In an Order dated May 18, 2001, relating to the scheduling of a hearing on Mother's Petition to Modify Custody, Judge Tumas found that Father was justified in the position that he took refusing to allow Mother to see J. until she first conferred with J.'s counselor, Dr. Susan Eppes, and deferred scheduling a hearing until such time as Mother filed her certificate evidencing completion of the parent education program as required by Family Court Civil Rule 16.2.

Extensive testimony was presented by both parties at the TPR hearing before the Court on November 9 and 14, 2001. Father called as witnesses, in addition to himself, C.D. and G.W., (J.'s Paternal and Maternal Grandmothers) D., (Stepmother) M., (Stepmother's Daughter) Lenora Dauphin, (Catholic Charities Social Worker) and Dr. Susan Eppes, Ph.D., (J.'s Treating Psychologist) who testified by telephone. Mother called as witnesses, in addition to herself, Pam Djakovich, (Her Therapist) Suzanne Lee, (C.'s Therapist) Carol Hamilton, John Brooks and D.C. At the request of Mother's counsel, Mother's son, C., as interviewed *in camera*.

With regard to the cross-objections filed by each party against the other's closing arguments, the Court's factual findings in this decision are based on the evidence presented at trial and not on the factual statements made by counsel in their closing arguments. To the extent that arguments of Counsel contain facts not in evidence, the objections are sustained.

## II. FACTUAL FINDINGS

J. was born September 17, 1992. Her parents married approximately five months after her birth. Early in J.'s life,

Father assumed the role of primary caregiver, which he has continued until today. While J. was just an infant, Mother began abusing drugs and spending her evenings and weekends away from J. and C., her son from a previous relationship. The parties separated in the summer of 1993 and Father and J. moved in with Father's mother, C.D. (Paternal Grandmother).

Mother's drug and criminal involvement continued after the parties' separation and became so serious that by 1995 her visitations with J. were limited to being supervised. Mother married K.G., in January of 1995, whom she testified was an alcoholic who was physically and emotionally abusive to her. Because of her situation, she agreed to give Father sole custody of J. and she abandoned her son C. to his maternal grandmother, G.W., where he remained until June of 2001. In April of 1997 Mother pled guilty to prostitution charges and in June of 1999 she was convicted for possessing cocaine and drug paraphernalia. Prior to February of 1999, Mother's visitation with J. was sporadic and inconsistent. Mother last had regular contact with J. on July 21, 1998, and the last time Mother and J. saw each other was in February of 1999. According to the diary kept by paternal grandmother, reflects that Mother missed 151 scheduled visits from mid–1993 until November 1999 the period Father and J. lived with her.

In September of 1999, Mother claims to have contacted paternal grandmother's home around the time of J.'s birthday, but no visit was arranged between the parties'. Father relocated from paternal grandmother's home in November of 1999, and specifically noted in his phone log a conversation he had with Mother in December of 1999, when he had given her his new phone number. In December of 1999, Mother advised Father that she wanted to arrange to take J. to visit her foster parent's home and to drop off Christmas presents. As Father was aware of Mother's criminal history and drug involvement, he declined to allow this, requesting that Mother meet with him and his then fiancé, now J.'s Stepmother, at Father's home. Mother declined to meet on these terms. Instead arrangements were made for Mother, Father and Stepmother to meet at a neutral location on January 2, 2000 at the Brookside Shopping Center. Mother failed to appear. Mother failed to reinitiate contact with Father until March 21, 2000, at which time she called and left a message with Father' mother. Father called back Mother requesting that Mother inform him of where she was currently residing. Mother refused. Father did not again hear from Mother for another 7½ months until an exchange of phone calls and messages during the week of September 7th through September 14, 2000.

Mother asserts that there were additional calls not recorded by Father. For example, Mother claims that she called paternal grandmother's home attempting to contact Father around Easter in April of 2000 and again called the left messages on paternal grandmother's machine in July and again in August of 2000. Despite Mother having Father's new phone number since December of 1999, Mother continued to call paternal grandmother's home looking for Father and not at his current residence or phone number.

As recently as August 16, 2000, Mother was still involved with drugs as evidenced by a violation of probation, which resulted in a fifteen day incarceration following a dirty urine screening. Following Mother's release from prison she made two calls again to paternal grandmother's home during the week of X 2000. On September 8th, Mother left a message claiming that she could not recall Father's new phone number which he had previously given her.

On September 10, 2000 Father returned Mother's call to the number she had left on the answering machine at his mother's home. When he returned Mother's call she did not answer to Father left a message that Mother should not call paternal grandmother anymore, and again gave Mother his phone number. It was Paternal Grandmother's practice generally to not return Mother's calls directly because Mother had repeatedly been provided with Father's new address and phone number and requests had been made repeatedly that Mother contact Father directly rather than trying to place paternal grandmother in the middle.

On September 13, 2000, Mother called Father at his residence leaving a message for Father to call "Richard" at a phone number different from the one she had left Father just three days earlier on September 10, 2000. The following day, September 14, 2000, Father returned Mother's call once again getting an answering machine and leaving a message. Father received a call back this time from a man identifying himself as "Victor Kowalski" who left a different number at which Father was to contact Mother. Father contacted Mother at this number at which time the two spoke for the first time in nine months. While Mother told Father that she wished to drop off presents for J., however, Mother failed to make any inquiry whatsoever about J.'s well-being at that time. Father advised Mother that J. was going through some difficult times emotionally and psychologically and based on the advice from Dr. Eppes and Dr. Bhatt, J.'s psychologist and psychiatrist, J. should not be exposed to Mother until she spoke with Dr. Eppes before re-establishing contact.

After conferring further Dr. Eppes, Father called Mother on October 3, 2000 and advised her that Dr. Eppes wished to discuss J.'s emotional health with her and provided Mother with the doctor's phone number and a request that Mother contact her. In May 2001, seven months later and two months after Father filed for TPR, Mother and Dr. Eppes finally spoke, but not because of any effort by Mother.

Having never heard from Mother, Dr. Eppes personally contacted Mother on April 11, 2001, attempting to set a time they could discuss her daughter's treatment. Mother's response was that she was too busy with her own doctor's appointments and transportation issues to come in to discuss her daughter's welfare. To date, Mother has never scheduled an appointment nor has she made any efforts to ascertain the nature of her daughter's problems. Mother testified that her disinterest in meeting with Dr. Eppes stems from Mother's belief that the doctor had already made up her mind against her.

Dr. Eppes, J.'s psychologist, testified that she had been treating J. since March of 2000 during which time they have had 37 sessions together. Specifically, she is treating J. for Attention Deficit Hyperactivity Disorder (ADHD) and Depression, for which J. takes medication. According to Dr. Eppes, J.'s progress has been on an up and down basis with a notable regression as of late. Anti-psychotic drugs have been added under the advisement of Dr. Bhatt. According to Dr. Eppes, the cause of J.'s emotional and psychological problems relate to her abandonment by her Mother and her anxiety and fear of being returned to Mother whom she views as deceitful. J. desires to be adopted by her Stepmother who she refers to as "Mom". Dr. Eppes is of the opinion that if termination of Mother's parental rights is not granted, this child's already severe anxiety and depression disorders will be exacerbated.

In October of 2000, Mother moved in with D.C. and his 18 year-old son, Christopher, where she continues to reside today, along with her son C. Mr. D.C. also has two other children, Jonathan, age 14, and Vanessa, age 10, who visit on the weekends. Mother claims to have a stable relationship with Mr. D.C. and his children. Mother relies on Mr. D.C. as her primary means of financial support. Mother admits to having virtually no income and no ability to support herself because of undocumented physical injuries inflicted upon her by a former boyfriend in May of 2000 as well as a back injury that occurred in February of 2001. Despite Mother claiming to have worked different jobs and having stable income in the past, Mother has never paid any support to Father for J., claiming that Father refused to accept support from Mother when offered. Mother's mother, G.W., testified that C. lived with her and her husband for approximately four years until June of 2001 when he returned to Mother. Mrs. Wilson testified that Mother only visited C. about three for four times over this four year period despite C.'s medical conditions including a severely cleft palate, speech problems and growth developmental delays. C. was interviewed *in camera* by this Court at which time C. spoke mainly about his relationship with J. and the fact that he misses her.

While C. resided with Ms. Wilson he had regular visitation with J. and her Father. C. last spent time with J. in March of 2001. At that time, he began weekend visits with his Mother and hence no longer had weekends available to visit with J. C.* maintained contact with J. by telephone until September 4, 2001, when during a phone call between C. and J., Father terminated the phone call because an incident that occurred. C.'s recollection of the event was that Mother told J. that she loved her and thereafter Father prohibited the children from speaking. Father claims that Mother who was present in the room with C. while the children were speaking yelled out to J. prompting Father to terminate the conversation. Father related he then called C. back and advised him that while he could speak with J., Father would not permit Mother to disrupt those calls. C. took it to mean he was no longer permitted to call. Father testified to this Court that he would like to see C. and J. re-establish their relationship. C. expressed a desire to see J. and hopes that the two will be able to resume contact soon. Similarly for J.'s benefit, Dr. Eppes testified that it is important for C. and J. to maintain a relationship provided it was on a supervised and monitored basis so as not to disrupt J.'s fragile emotional state.

J. has lived with Father her entire life, and during the past two years, with Stepmother and her sixteen year-old daughter, M. as well. Stepmother is a trained interpreter working with children with disabilities at the Delaware School for the Deaf. She is very familiar with the issues involving J.'s ADHD, as her own daughter M. is afflicted with ADD, absent the hyperactivity. Stepmother has actively involved herself in J.'s life and dealing with her mental health problems by routinely transporting her to her appointments, and attending counseling sessions. Moreover, she has spent time with the psychiatrist relating to medication adjustment issues and with the psychologist in family counseling sessions. The bond between Stepmother and J. has evolved into a strong close and caring relationship. Likewise, with regard to J.'s relationship with M., she and J. get along like sisters, doing a number of activities, going to the park and store and even "fighting like sisters" do.

## III. CONTENTIONS OF THE PARTIES

Father first contends that Mother, through her conduct, both intended to and

in fact "abandoned" J. as that term is defined in 13 *Del.C.* § 1103(a)(2) a. 2.[1] in that for a period of six consecutive months in the year preceding the filing of the Petition to Terminate Parental Rights, mother failed to communicate or visit regularly with J. As Father filed his Petition on March 13, 2001, the Court is called upon to examine the one year period running from March 13, 2000, to the date of filing. Father argues that from March 13, 2000, through X 2000, Mother had no contact whatsoever and that the little contact she had thereafter with Father, coupled with Mother's failure to talk to the child's psychologist concerning her fragile emotional state evidences an intent to abandon the child. Father asserts, that in fact

---

1. The definition of "abandon" as found in 13 *Del.C.* § 1101(1) was amended effective July 13, 2000, to refer solely to the definition as stated in 13 *Del.C.* § 1103(a)(2) which states, in relevant part:

 "(a) The procedure for termination of parental rights for the purpose of adoption or, if a suitable adoption plan cannot be effected, for the purpose of providing for the care of the child by some other plan which may or may not contemplate the continued possibility of eventual adoption, may be initiated whenever it appears to be in the child's best interest and that 1 or more of the following grounds exist:
 (2) The child has been abandoned.
 a. The Court may order a termination of parental rights based upon abandonment if the Court finds that the following occurred and that the respondent intended to abandon the child:
 ...
 2. In the case of a minor who has attained 6 months of age at the time a petition for termination of parental rights is filed, the respondent, for a period of at least 6 consecutive months in the year preceding the filing of the petition, has failed to:
 A. Communicate or visit regularly with the minor;
 ...
 b. In cases in which no finding of intent to abandon has been made, the Court may order a termination of parental rights based upon abandonment if the Court finds that the respondent, for a period of at least 12 consecutive months in the 18 months preceding the filing of the petition, has failed to:
 1. Communicate or visit regularly with the minor;
 2. File or pursue a pending petition to establish paternity or to establish a right to have contact or visitation with the minor;

 ...
 and if the Court finds that one of the following grounds exist:
 ...
 2. If the minor is in the legal and physical custody of the other parent and a stepparent, and the stepparent is the prospective adoptive parent, the respondent is not able or willing promptly to establish and maintain contact with the minor and to pay for the minor's support, in accordance with the respondent's financial means;
 3. Placing the minor in the respondent's legal and physical custody would pose a risk of substantial harm to the physical or psychological well-being of the minor because the circumstances of the minor's conception, the respondent's behavior during the mother's pregnancy or since the minor's birth, or the respondent's behavior with respect to other minors, indicates that the respondent is unfit to maintain a relationship of parent and child with the minor; or
 4. Failure to terminate would be detrimental to the minor. In determining whether a failure to terminate would be detrimental to the minor, the Court shall consider any relevant factor, including the respondent's efforts to obtain or maintain legal and physical custody of the minor, the role of other persons in thwarting the respondent's efforts to assert parental rights, the respondent's ability to care for the minor, the age of the minor, the quality of any previous relationship between the respondent and the minor and between the respondent and any other minor children, the duration and suitability of the minor's present custodial environment and the effect of a change of physical custody on the minor.
 c. The respondent's act of abandonment cannot be cured by subsequent conduct."

Mother last had any regular contact with J. on July 21, 1998, and that Mother and J. have not seen each other since.

February of 1999. Thereafter, Father asserts, the few times that Mother did contact Father regarding J., her ongoing substance abuse and criminal involvement along with her refusal to follow J.'s psychiatrist's and psychologist's recommendations that Mother consult with them before attempting to re-establish any contact with the child further evidenced Mother's intent to abandon within the six month required statutory period.

In the alternative, Father contends that should the Court find that notwithstanding Mother's conduct, there was no intent to abandon on the part of Mother, that Father is nevertheless entitled to an Order terminating Mother's parental rights under the provisions of 13 Del.C. § 1103(a)(2) b. in that in the 18 month period preceding the March 13, 2001 filing of the Petition for TPR, Mother did, for a period of at least 12 consecutive months similarly fail to communicate or visit regularly with J. and that the failure to terminate Mother's parental rights would be detrimental to

the child. In this regard, Father points to a period in excess of two years with no regular communication or visits from Mother, the refusal of Mother to even consider J.'s psychological needs the testimony of J.'s psychologist, Dr. Susan Eppes, that the failure to terminate Mother's parental rights would have a very detrimental effect of the well-being of this child as constituting the statutory criteria for termination.

Mother, in opposition to the Petition, denies that she has abandoned the child. Mother argues that during the two year period prior to the filing of the Petition, 1999 and 2000, she had virtually no income and is not able to work as the result of an injury inflicted upon her by her former boyfriend in May of 2000 as well as a back injury that occurred in February of 2001, and even if she had been able to work, Mother claims Father refused to accept child support from her when offered.[2] Mother asserts that she never intended to abandon the child, that she had attempted to communicate and visit the child but despite her best efforts, had been unable to see her daughter since February of 1999 through what Mother described as a con-

2. Mother incorrectly relies upon the definition of "abandoned" as set forth in the predecessor to the current statute, which, had formerly been defined in 13 Del.C. § 1101(1) as:
 c. A minor who has attained 6 months of age at the time a petition for termination of parental rights has been filed, and for whom the respondent, for a period of at least 6 consecutive months immediately preceding the filing of the petition, has failed to:
 1. Make reasonable and consistent payments, in accordance with the respondents financial means, for support of the minor; and
 2. Communicate or visit regularly with the minor; . . .
 The respondent's act of abandonment cannot be cured by subsequent conduct. No present intent to abandon the minor need be proved by the petitioner.

The new definition of abandonment, became effective July 13, 2000, as set forth in 13 Del.C. § 1103(a)(2) with regard to those instances where the Court finds that there was an "intent to abandon" changes the focus of the Court's inquiry from the 6 month period immediately preceding the filing of the petition to any consecutive 6 month period occurring within the 12 months immediately preceding the filing of the petition and removes consideration of financial support of the child by respondent as a basis of abandonment during the requisite 6 month period. The current statute, while retaining the provision that "the respondent's act of abandonment cannot be cured by subsequent conduct" no longer contains the provision "no present intent to abandon the minor need be proved by the petitioner", previously set forth in the predecessor version of 13 Del.C. § 1101(1).

sistent plan by Father to deny Mother access to J. by placing unreasonable conditions on her seeing her daughter. Mother further asserts that her lack of intention to abandon her daughter is evidenced by Mother's three Family Court filings beginning October 16, 2000, those being Mother's Motion for Modification of Visitation, a Petition–RTSC to hold Father in contempt for allegedly interfering with Mother's visitation, and a Motion to Modify Custody all of which were filed after Mother learned of Father's intent to seek TPR.

Even if the Court finds that there was no intent to abandon, but that mother nevertheless abandoned J., Mother asserts that the evidence nevertheless still does not establish the alternate statutory basis for termination of parental rights by clear and convincing evidence. In this regard, Mother argues that she has the ability and willingness to rebuild and establish a relationship with her daughter and support her, Mother poses no risk to the child at this time because Mother is not requesting custody of the child and that denying termination of parental rights and allowing Mother to re-establish a relationship with her daughter would be in the minor's best interest, notwithstanding the child's treating psychologist's testimony to the contrary. In this latter regard, Mother asserts that the child's current fragile and emotional state is the result of confusion and guilt that J. feels as the result of petitioner trying to replace respondent with a new Mother. Mother point other success in re-establishing her relationship with her son C. as well as relationship that previously existed between J. and C. in rebuttal to Father's argument that termination of parental rights would be in J.'s best interest. Mother points to the testimony of her social worker therapist as well as C.'s to the effect that Mother has dem-

onstrated her ability and willingness to parent by virtue of her success in re-establishing her relationship with C.

## IV. *STATUTORY GROUNDS FOR TPR*

 Parental rights are fundamental individual liberties that arise from the natural relationship between parent and child. In the absence of the most compelling reasons, Courts may not severe these parental ties. *In the Interest of Kelly Stevens*, Del.Supr., 652 A.2d 18, 24 (1995); *In re Burns*, Del.Supr., 519 A.2d 638, 645 (1986); *Daber v. Division of Protective Services*, Del.Supr., 470 A.2d 723, 726 (1983). In Delaware, the statutory standard for termination of parental rights requires both proof of an enumerated statutory ground and a finding that termination of one's parental rights would be in the best interest of the child,[3] and while only one of the enumerated statutory basis for termination must be found before considering whether termination of parental rights is in the best interest of the child, *Division of Family Services v. Hutton*, Del.Supr., 765 A.2d 1267, 1271 (2001), the requirement that severing the parental rights is in the best interest of the child cannot be dispensed with.

Furthermore, because parental rights are a fundamental liberty, the Delaware Supreme Court has consistently held that termination may occur only upon a showing "by clear and convincing evidence, that the parent is unable to meet the statutory guidelines". *Division of Family Services v. Hutton*, Supra, at 1271, *In re Hanks*, Del.Supr., 553 A.2d 1171, 1178 (1989). This standard of proof, that of "clear and convincing evidence", requires greater certainty about the factual conclusions necessary to satisfy due process

---

**3.** 13 *Del.C.* § 1103(a)(2)

than the preponderance of the evidence standard, typical is most civil cases, thereby emphasizing the fundamental liberty interest at stake and the unique type of deprivation that may occur if the petition is granted. *Patricia A.F. v. James R.F.* Del.Supr., 451 A.2d 830, 831 (1982).

■ Petitioner alleges, as his first statutory ground for termination of Mother's parental rights, Mother's intentional abandonment of J. Prior to July 30, 2000, a child in the custody of one parent who had attained 6 months of age, was "abandoned" for purposes of termination of parental rights where during the 6 consecutive months preceding the filing of the petition, the other parent had failed to: (1) make reasonable and consistent payments, in accordance with the respondent's financial means, for support of the minor; and (2) communicate or visit regularly with the minor. This is the statute relied by Mother in her Argument. As of July 30, 2000, the statutory basis for intentional abandonment had been narrowed to a finding of failure of the parent to "communicate or visit regularly with the minor" so long as such failure occurred for a 6 consecutive month period during the one year period immediately preceding the filing of the petition.[4] While a literal reading of the statute's language by itself could lead to an interpretation that a mere showing of failure to communicate or visit during the requisite time period constitutes abandonment *per se*, our Courts have held that in addition to meeting the statutory requirement for abandonment, there must also be a finding of a "settled purpose" on the parent's part to abandon the child and surrender all further parental claims to the child. This had been held to constitute a present continuing intent to abandon up to the time the termination proceedings were filed. In determining the intent, the Court was to view evidence not only of subjective intent, but of conduct as well. *Division of Social Services v. Tusiki,* Del. Fam. Ct. 446 A.2d 1109, 1111 (1982); *Black v. Gray,* Del.Supr., 540 A.2d 431 (1988); *In re Stevens (Kelly),* Del.Supr., 652 A.2d 18 (1995).

■ While case law has held that there must be a showing of a present continuing intent to abandon up to the time the termination proceedings were filed, the statutorily mandated time period for determining abandonment was previously the 6 month period immediately preceding the filing of the petition. The 2000 amendment to the statute appears to change all that. No longer is abandonment established by respondent's conduct during the 6 months period immediately preceding the filing of the petition, but rather, by any such conduct occurring during the consecutive 6 month period in the full calendar year prior to the petition being filed.[5] The legislature when enacting statutory changes is presumed to have knowledge of the existence and effect of prior law. *Scribner v. Chonofsky,* Del.Supr., 310 A.2d 924 (1973). Notwithstanding the recognition by the legislature that the Courts had previously held that an intent to abandon must continue up to the time of the filing, the legislature once again specifically included a proviso that "the respondent's act of abandonment cannot be cured by subsequent conduct".[6] This language first appeared in the 1996 version of the TPR Statute.[7] By providing that the 6 month

4. 13 *Del.C.* § 1103(a)(2)a.2.

5. 13 *Del.C.* § 1103(a)(2)a.2.

6. 13 *Del.C.* § 1103(a)(2)c.

7. The previous enactment was found in 13 *Del.C.* § 1101(1) which was effective for all petitions filed after October 3, 1996 up to July 12, 2000.

period of non contact sufficient to constitute an act of abandonment could occur and be completed at any time during the one year period proceeding the filing of the TPR petition, the legislature clearly intended to foreclose the possibility that a parent found to have intentionally abandoned their child for a 6 month period could not thereafter, just prior to the filing of the TPR petition, attempt to rehabilitate themselves and terminate the abandonment, by some post abandonment conduct. By re-enacting the provision that the respondent's act of abandonment cannot be cured by subsequent conduct, the legislature has expressed its clear intent that once the abandonment has been established respondent's conduct cannot be considered by the Court as having terminated the abandonment and thereby defeat the finding that a statutory ground had been met. The language of the statute is clear and unambiguous on this point and must be given its plain meaning. *Moore v. Chrysler Corp.* Del.Supr., 233 A.2d 53, 55 (1967). Nevertheless, while respondent's subsequent conduct may not form the basis for curing the act of abandonment, such conduct must still be considered by the Court in determining whether the respondent intended to abandon her child. *Cline v. Hartzler*, Del.Supr., 227 A.2d 210 (1967); *Division of Soc. Serv. v. Tusiki*, Del.Fam. Ct. 446 A.2d 1109, 1111 (1982); *Black v. Gray*, Del.Supr., 540 A.2d 431 (1988) and the Court's consideration of such conduct therefore remains relevant to an inquiry under Section 1103(a)(2)a.2.

To determine whether Mother committed an act of intentional abandonment, it is necessary to examine the 12 month period immediately preceding March 13, 2001, specifically to determine whether during such period, Mother failed to communicate or visit regularly with her daughter during a period of 6 consecutive months. The absence of any contact by Mother with J.

began long before March 13, 2000, the beginning date for the purposes of our one year analysis. Under this section, Mother, whose contact with her daughter over the preceding years could best be described as sporadic, disappeared from the child's life months at a time, and last saw her daughter in February of 1999. Throughout most of the year 2000, Mother made no attempts whatsoever to initiate any communication with daughter. In her first conversation with Father in nine months Mother made not one inquiry about J.'s well-being, notwithstanding the fact that Mother had not seen her daughter in more than a year-and-a-half. When Father explained to Mother that J. was going through psychological difficulties, was being treated by Dr. Bhatt and Eppes and that they had recommended against exposing J. to Mother at that time, Mother still did not ask anything about her daughter's condition.

Three weeks later on October 3, 2000, Father called Mother and advised her that Dr. Eppes wished to discuss with Mother J.'s emotional health and provided Mother with Dr. Eppes phone number with a request that Mother call her. Mother again demonstrated little interest in her daughter by ignoring Father's request and failing to call Dr. Eppes. It wasn't until two months after this Petition to Terminate Mother's Parental Rights was filed that Mother did speak with Dr. Eppes, and then only after Dr. Eppes initiated the call, and yet Mother still never did schedule the appointment requested by the psychologist nor, to date, has Mother had any discussions with J.'s psychologist, Dr. Eppes or her psychiatrist, Dr. Bhatt, about her daughter's well-being.

The evidence is clear and convincing that Mother has failed to communicate or visit regularly with her daughter for a period in excess of 6 consecutive months

during the year preceding the filing of the TPR Petition. There were no visits whatsoever between Mother and daughter. The exchange of phone messages between Father and Mother, or Father and intermediaries on behalf of Mother between September 7th and 14th culminating in Father's advising Mother on September 14th regarding the child's mental health problems and recommendations from her doctors does not constitute communication, let alone regular communication with the child as called for under the statute.

 The next question that must be answered is whether Mother intended to abandon the child. The abandonment of a child by a parent is demonstrated preliminarily by any conduct on the part of a parent evidencing a settled purpose to forego all parental duties and relinquish all parental claims to the child. *Cline v. Hartzler,* Del.Supr., 227 A.2d 210 (1967). In determining intent, the Court must view evidence not only of subjective intent, but of conduct as well. *Division of Soc. Serv. v. Tusiki,* Del.Fam. Ct. 446 A.2d 1109, 1111 (1982); *Black v. Gray,* Del. Supr., 540 A.2d 431 (1988) *In re Kelly Stevens,* Del.Supr., 652 A.2d 18 (1995) While Mother denies that she ever intended to abandon J. and forego her parental responsibilities, the evidence as established through Mother's conduct points to a different conclusion. From the child's earliest age, Mother has never exercised any parental responsibility towards her daughter, being content to have that burden be shouldered solely by Father. Following the parties' separation when J. was approximately one year old, the child never lived with Mother, first living with Father and paternal grandmother in grandmother's home, and since December, 1999, with Father, Stepmother and Stepmother's daughter in their new home.

Mother became a drug user before the parties separated. By April of 1995, Mother's drug involvement became so serious that her visitations with J. had to be supervised. Mother missed 151 scheduled visitations during the period that Father and J. lived with paternal grandmother. Mother has never made any payments towards child support and has rarely shown any interest in her daughter until being advised by Stepmother in October of, 2000, that Stepmother desired to adopt J. Mother accepts no personal responsibility for these failures on her part, blaming her absence from her daughter's life to her years of drug use and poor choices of domestic partners, resulting in abusive relationships. In April of 1997 Mother plead guilty to prostitution. In June of 1999 she was convicted for possessing drug paraphernalia. As recently as August of 2000, Mother was still involved with drugs as evidenced by her violation of probation following a dirty urine screen. Yet Mother seeks to have the court ignore these years of her life as if they never existed.

In October of 2000, Mother moved in with D.C. and his 18 year-old son, Christopher. Mother currently relies on Mr. D.C. as her primary means of support. Mother points to her stable relationship with D.C., her relationship with his 14 year-old and 10 year-old daughter who visit on weekends and the re-establishment of her role as primary caretaker for her son, C., who she had abandoned years ago and who spent four plus years residing with his maternal grandmother, as evidence that she is now able and willing to discharge her parental responsibilities toward J. Mother cites her filing of a Petition to Modify Custody in Sussex County on October 16, 2000, along with her later filings on February 2, 2001, and March 13, 2001, as evidence that she has no continuing intent to abandon her daughter relying upon *Black v. Gray,* Del.Supr., 540 A.2d 431

(1988) for the proposition that such filings on her part evidence no continuing intent to abandon. As if the mere filing on her part makes up for years of neglect. The Delaware Supreme Court in *In re Kelly Stevens,* specifically took up this issue. As the Court stated in footnote 7 of that decision:

> "The initiation of legal proceedings has been construed as constituting a *prima facia* showing of substantial contact e.g., a good faith petition for visitation. This *prima facia* construction of substantial contact encourages participation in the judicial process, rather than self-help, by providing for a technical avoidance of the statutory definition for abandonment. If it is subsequently determined, however, that the legal proceedings were either not initiated in good faith or not pursued in good faith, the *prima facia* basis for finding a technical avoidance of the statute would be rebutted, and the statutory definition of abandonment would be satisfied."

Responsible parenting requires more than the technical avoidance of statutory consequences where the evidence clearly establishes the parent had a settled purpose to abandon. Such is the case before this Court. The Court notes that Mother filed her October 16, 2000, petition seeking the modified custody only after learning that Father desired that Mother terminate her parental rights. Mother ignored both Father's and Dr. Eppes' repeated attempts to have Mother understand her child's emotional needs only to have Mother reject them both. Had Mother expressed concern in her daughter's condition and with meeting with the doctors, perhaps the Court could be persuaded otherwise. Instead, Mother made no efforts whatsoever to ascertain the nature of her daughter's problems.

Mother, throughout these proceedings, has attempted to paint a picture that she was the victim of Father's intentional blocking of her efforts to maintain contact with her daughter. Mother points to phone messages left with paternal grandmother which she claims were not returned, her lack of knowledge as to Father's whereabouts, and her claim that Father refused to allow her to see J. Father acknowledges that paternal grandmother did not return Mother's calls, the reason being that Mother had repeatedly been provided with Father's new address and phone number and requests had been made of Mother that she contact Father directly rather than trying to place paternal grandmother in the middle. Any failure on the part of the Mother to maintain contact with her daughter was not due to interference by Father, but by Mother's own conduct. Indeed, this very issue has already been litigated between the parties. On March 13, 2001, Mother filed a Petition–RTSC alleging "Robert has not let me see my daughter since February 21, 1999. He moved, I did not know where he was or where or how my daughter was." On May 14, 2001, following a hearing on this Petition–RTSC, Judge Tumas of this Court dismissed Mother's Petition stating that:

> "the Court having heard testimony from Mother, and Mother having admitted that she failed to maintain contact with Father and J. after August 2, 1998, because she was in an abusive relationship and resumed abusing substances;
>
> **IT IS HEREBY ORDERED** that Mother's Petition is **DISMISSED**, on the ground that no basis exists to hold Father in contempt of Court when, for at least two years following the entry of the 1998 Order, Mother failed to exercise (or seek enforcement) the visitation afforded her under the Order."

Mother's conduct evidences a clear pattern of ignoring of parental responsibility, placing her own self interest ahead of any concern for her daughter's well being. This evidence clearly constitutes evidence of intentional abandonment.

■ While only one ground for TPR must be proven the Court will nevertheless address alternate theories presented by Father. Father alternately argues that the statutory basis of abandonment has been met, even if the Court were to find that Respondent Mother had not intended to abandon her daughter. Father asserts that the evidence establishes that Mother failed to communicate or visit regularly with J. for a period of at least 12 consecutive months in the 18 month period preceding the filing of the petition and that one of the additional specified statutory requirements has also been met.[8] The first question the Court must address is whether Mother failed to communicate or visit regularly with the minor during a period of at least 12 consecutive months in the 18 months preceding the filing of the petition. The evidence is clear and convincing on this point in the affirmative. Since the parties are both in agreement that Mother has not visited her daughter since February of 1999, the Court's inquiry in this regard is limited to whether there is clear and convincing evidence that Mother has failed to communicate regularly with her daughter during the same consecutive 12 month period beginning March 13, 1999, 18 months prior to the filing of the TPR Petition. In this the Court must answer in the affirmative as well. In September of 1999, Mother phoned paternal grandmother's home around the time of

---

**8.** 13 *Del.C.* § 1103(a)(2)b. provides that:

"In cases in which no finding of intent to abandon has been made, the Court may order a termination of parental rights based upon abandonment if the Court finds that the respondent, for a period of a least 12 consecutive months in the 18 months preceding the filing of the petition, has failed to:

1. Communicate or visit regularly with the minor;
2. File or pursue a pending petition to establish paternity or to establish a right to have contact or visitation with the minor;

. . .

and if the Court finds that one of the following grounds exists:

1 . . .
2 . . .
3. If the minor is in the legal and physical custody of the other parent and a stepparent, and the stepparent is the prospective adoptive parent, the respondent is not able or willing promptly to establish or maintain contact with the minor and to pay for the minor's support, in accordance with the respondent's financial means;
4. Placing the minor in the respondent's legal and physical custody would pose a risk of substantial harm to the physical or psychological well-being of the minor because the circumstances of the minor's conception, the respondent's behavior during the mother's pregnancy or since the minor's birth, or the respondent's behavior with respect to other minors, indicates that the respondent is unfit to maintain a relationship of parent and child with the minor; or
5. Failure to terminate would be detrimental to the minor. In determining whether a failure to termination would be detrimental to the minor, the court shall consider any relevant factor, including the respondent's efforts to obtain or maintain legal and physical custody of the minor, the role of other persons in thwarting the respondent's efforts to assert parental rights, respondent's ability to care for the minor, the age of the minor, the quality of any previous relationship between the respondent and the minor and between the respondent and the other minor children, the duration and suitability of the minor's present custodial environment and the effect of a change of physical custody on the minor."

J.'s birthday. Three months later, in December of 1999, Mother again called paternal grandmother's home leaving a message for Father, which Father returned on December 29th leaving a message for Mother. When the parties finally spoke, Mother advised that she wanted to arrange to take J. for a visit to her foster parent's home. Concerned about Mother's criminal and drug history, Father first required of Mother she meet Father and his fiancé at a neutral site to discuss the matter. Mother failed to appear and once again disappeared until March 21, 2000 when a message was left on grandmother's answering machine. When Father called back and requested Mother advise him where she was then living, Mother refused. Father did not hear again from Mother for another 7½ months until the exchange of phone calls and messages during the period of September 7th through 14th, previously discussed by the Court. While Mother asserts that there were additional contacts not reported by Father, a message left on grandmother's machine in April, one in July, and another in August 2000. None of these calls were made to Father's residence, but rather to his mothers and none of the calls resulted in any communication between Mother and J. In short, there was no communication with daughter during this entire 12 month period, just perhaps a half dozen "call me" messages exchanged and a last minute request to remove the child at Christmas and the delivery of presents. At best, these sporadic phone messages and calls constitute 5 "events" which cannot be viewed as regular communication with her daughter. Indeed, the calls made by Mother, or intermediaries acting on her behalf, were frequently made to paternal grandmother's home, notwithstanding the fact that Mother had previously been provided with Father's new phone number. If Mother believed as she now claims, the Father was interfering with Mother's ability to visit or communicate with her daughter, she need only have sought timely recourse under 13 *Del.C.* § 728. The evidence is clear and convincing that Mother's actions during the 12 month period with regard to communicating with her daughter were minimal if at all and clearly do not begin to rise to the level of regular communication as mandated by the statute.

Having determined that Mother failed to communicate or visit regularly with her daughter during this period, the Court's inquiry must now turn to whether Petitioner has established one of the additional criteria required to be proven under 13 *Del.C.* § 1103(a)(2)b., or 3., or 4.

The first element the Court considers is whether the Respondent has the ability or willingness to promptly establish and maintain contact with her daughter and pay for her support in accordance with her financial means. Respondent is clearly willing to re-establish a relationship with her daughter as evidenced by the testimony of Respondent and a number of witnesses that she called. In addition to this subjective evidence, the Court believes that Respondent's resumption of custody of her son, C., and re-establishment of that relationship after years of abandonment supports Respondent's position in this regard. The extent to which Respondent will maintain such contact and the issue of whether Respondent will pay support in accordance with her financial means is more troublesome for the Court. Respondent's desire to play some meaningful role in her daughter's life is newly acquired, and I believe highly dependent upon the success of her relationship with D.C. Prior to moving in with D.C. approximately one year before the hearing, a substantial portion of Respondent's adult life revolved around drugs and domestic violence. Re-

spondent professes to have no ability to support herself because of undocumented physical injuries, although she presented neither any medical nor vocational evidence to support these claims. Nor does the Court give D.C.'s testimony that he would be willing to support J. if she moved into his home any weight in this regard as he is neither under any obligation to provide financial support, nor, is his ability or willingness to support this child at issue here, rather, the willingness and ability is Respondent's. Nevertheless, the burden of proof in this regard rests upon the Petitioner and having presented no evidence to counter the evidence that Respondent has but minimal financial means to provide support, the Court cannot find that the evidence is clear and convincing in favor of Petitioner on this point and therefore the proof fails on this element.

Element number 3 addresses the issue of the effects on this child if the Court were to place her in the legal and physical custody of Respondent. Would such action pose a risk of substantial harm to the physical or psychological well-being of the child because Respondent's behavior since J.'s birth indicates that Respondent is unfit to maintain a relationship of parent and child with her. While Petitioner does not address this point in her closing argument, Respondent does. Respondent asked the Court to ignore this element on the basis that there is no risk involved since Respondent is not requesting custody at this time but seeks only to work in "supervised counseling situation with Minor and Minor with her son to help Minor deal with her feelings of abandonment and rejection...". Respondent cannot avoid the Court's consideration of this element merely by now professing that she does not wish custody. Subparagraph 3 does not speak to the issue of whether Respondent is seeking custody, but rather calls upon the Court to consider whether placing the child in "legal and physical custody" poses serious risk to the child and whether that risk is the result of the Respondent's conduct. The Court however does find Respondent's closing argument that she is not seeking custody at this time significant in that it is the very act of filing a petition for custody upon which Respondent argued established that she did not intend to abandon her child. Respondent's acknowledgement that she does not seek custody reinforces the Court's conclusion that the filing of such petition after learning of Stepmother's desire to adopt J. was not done in good faith, nor designed to promote the best interest's of her daughter, but rather was done solely as an exercise in form over substance in an attempt to avoid the consequences of her total failure to discharge parental responsibilities over virtually the entire life of this child.

To determine the effects on J. if she were placed in the custody of Mother, one must consider the testimony of Dr. Eppes, J.'s clinical psychologist who has been treating her since March of 2000 during which time she has held some 37 sessions with J., treating J. for ADHD and severe depression. The primary catalyst for recent psychotic episodes experienced by J. according to Dr. Eppes relate to her fear of being returned to her Mother. Dr. Eppes is of the opinion that if termination of Mother's parental rights is not granted, this child's anxiety and depression disorders will be exacerbated. Respondent's failure to take seriously J.'s psychological well-being, her placing her own self interests above her daughter's well-being and her dismissal of Dr. Eppes' attempt to educate Mother as to the seriousness of J.'s condition by flippantly concluding that the doctor had already made up her mind against her, causes the Court to conclude that the evidence is clear and convincing that placing this minor in Respondent's

legal and physical custody would pose a risk of substantial harm to the child's psychological well-being because of the Respondent's behavior since the child's birth. Element number 3 has therefore been met.

Petitioner has also established by clear and convincing evidence an alternative element, that being number 4, that, failure to terminate would be detrimental to this child. In reaching this conclusion, the Court has considered the factors outlined in the statute. With regard to Respondent's efforts to obtain or maintain legal and physical custody of her daughter, her efforts over the years were minimal at best. Except for the first year of this minor's life, she has never lived with her Mother, Mother's physical custody being limited to the brief period of time when she and Father lived together. With regard to the role of other person's in thwarting Mother's efforts to assert parental rights, while Mother claims Father has in fact blocked her attempts to assert parental rights, Judge Tumas in her Order of May 14, 2001, found to the contrary and I do likewise. Viewed in the light of Mother's prolonged substance abuse and abandonment of J., the emotional difficulties that J. was experiencing directly attributable to Mother's conduct, and lack of information provided Father as to where Mother was residing in any given time, Father was justified in placing reasonable restrictions on Mother's visitations or contact. Nor can the Court accept Mother's view that Father's request that she confer with and meet J.'s psychologist to discuss the nature of J.'s illness and her treatment constituted an effort to thwart Mother asserting parental rights. Nor has Father interfered with Mother's exercise of parental rights because, as Mother claims, he wouldn't provide her with his address or phone number. Evidence from the telephone log maintained by Father and Stepmother, Father's testimony and that of paternal grandmother, C.D., evidence that Mother was provided information as to Father's address and telephone number on several occasions, and no one other than Mother can be held responsible for her repeated failures to either record the information or remember it.

The Respondent's ability to care for the minor is not an issue as Respondent herself admits that she is not seeking custody. Furthermore, Respondent has no financial resources or any prospects for immediate employment at the time of the hearing. The minor's frail emotional state, attributable directly to Mother's conduct, renders the issue of Mother's care of her daughter an impossibility, under any circumstance.

J* * * is 9 years old. Since the time she was an infant, the quality of Mother's relationship with J. has been abysmal. Prior to February 1999, Mother's visitation was sporadic, limited and inconsistent. There has been no relationship for the past 3 years. The relationship between Respondent Mother and other minor children present's a somewhat different picture. Mother has a son, C., by a prior relationship. When Mother and Father were living together, Petitioner served in the role as C.'s surrogate Father. The relationship appeared to be a good one and lasted long after Mother abandoned both of her children in 1995. Mother's abandonment of C. lasted until June 2001 following years of living with his maternal grandmother, G.W. C. suffers from ADHD, and a medical condition called Munchhausen's syndrome which resulted in a severe developmental and growth delay. Mother participated little in C.'s medical care or counseling during the years that C. lived with his grandmother. While living with his grandmother C. continued to maintain a relationship with J. and her Father, Mother's two children regularly spending time with each other in

their respective homes. C. was interviewed *in camera*. After hearing testimony about his sensitivity to his size and prior speech difficulties due to a severely cleft palate which required multiple surgeries over the years, the Court was pleasantly surprised to find that he had now developed into a very articulate, expressive, if still somewhat diminutive thirteen year old. C. spoke mostly about his relationship with J., the times they spent together and how fond he is of her and that fact that he misses her. He last spent time with J. in March of 2001. At that time, he had begun weekend visits with his Mother who had moved in with D.C.'s house in Milford and had no longer had weekends available for visits with J. He maintained telephone contact with J. until a phone call between C. and J., when an incident occurred resulting in Father hanging up the phone. C.'s recollection is that he told J. that "mom" loved her and that Father got upset and hung up the phone. Father then called C. back and C. believes that he was informed that he could no longer call J. Father's version of the incident, to which he had previously testified in the hearing, was that Mother who was present in the room while C. was talking with J. yelled out to J.* prompting Father to disconnect J. from the call. Father relates that he then called C. back and advised him that while he could talk to J., Father would not permit Mother to interrupt those calls.

The impression the Court got from C. was that he is happy with his current relationship with his Mother, notwithstanding the earlier years of abandonment by her. C. expressed a desire to see J., either at his house, or hers and hoped that they would be able to re-establish that relationship. Father expressed a similar desire for C. and J. to be able to re-establish and maintain their relationship, even if the Court should terminate Mother's parental rights with regard to J. Interestingly, C. advised that while he always got along very well with Father, and was happy living with maternal grandmother, he now is angry and resentful toward both of them, based upon things Mother has told C., they have said or done, some of which first came to light during the testimony at the hearing, prior to the Court's interview with C. Whether intentionally or not, it appears that this child has been placed in the middle of this dispute between the parties by Mother relaying to him pieces of testimony from the hearing, behavior the Court believes was both unnecessary and inappropriate.

With regard to the duration and suitability of the minor's present custodial environment and the effect of any change of physical custody on this child, J. has lived her entire life with Father and, during the past two years, with Stepmother and her sixteen year old daughter, M. According to M., she and J. get along like sisters, doing a number of things together such as going to the store and park and "even fighting like sisters". Like Stepmother, M. describes J.'s relationship with her mother as it being a close, mother daughter relationship. While a change in J.'s custodial environment is not an issue, any interference with this environment would probably be devastating emotionally to this child. The evidence supports a finding that like element 3, element 4 is clearly present in this case.

In summary, the Court has concluded that there is clear and convincing evidence in this case that this child has been abandoned by virtue of (1) the failure of Mother to communicate or visit regularly with her minor daughter for a period of at least 6 consecutive months in the year preceding the filing of the petition as well as (2) failure to communicate or visit regularly with the minor and (3) failure to file or

pursue a pending petition to establish contact or visitation with this child for a period of at least 12 consecutive months during the 18 month period preceding the filing of the petition, coupled with the Court's finding that (a) placing this child in Mother's legal and physical custody would pose a risk of substantial harm to the emotional well being of the child because of the Respondent's behavior since her daughter's birth indicates that Respondent is unfit to maintain a relationship of parent and child with this child and, alternatively (b) failure to terminate Mother's parental rights would be detrimental to her daughter.

## V. BEST INTEREST

Having concluded that at least one of the statutory grounds for Termination of Parental Rights has been established in this case both intentional as well as non-intentional abandonment, the petition for termination will nevertheless not be granted unless Petitioner further has proven by clear and convincing evidence that Termination of Parental Rights is in this child's best interests. *In re Burns*, Del.Supr., 519 A.2d 638; *Division of Family Services v. Hutton*, Del.Supr., 765 A.2d 1267 (2001). While what constitutes "best interest of the child" depends on the particular facts in any given case, the Court, while considering all relevant factors, must include consideration of the factors set forth in 13 *Del.C.* § 722.[9]

(1) With regard to *the wishes of the child's parent or parents as to his or her custody and residential arrangements,* while custody or residential arrangements are not an issue in this case, on the issue of Termination of Parental Rights, clearly and obviously, Father and Mother disagree on this point. Father wishes that Mother's parental rights be terminated so that Stepmother may adopt J. and thereby formalize and legitimize the "defacto" relationship of Mother and daughter that currently exists. Mother on the other hand opposes the Termination of her Parental Rights and desires an opportunity to establish a relationship with her daughter which, for all intents and purposes has never existed.

(2) With regard to *the wishes of the child as to his or her custodian(s) and residential arrangements,* as expressed before, the issue to be considered here is the child's wishes with regard to termination of parental rights and adoption by Stepmother. While J. did not testify, her wishes, as presented through the testimony of others, are not in doubt. Father, Stepmother, M., and Dr. Eppes all testified that this minor desires to be adopted by Stepmother who she refers to as "mom". According to Dr. Eppes, while initially, J. focused on the question as to

---

**9.** 13 *Del. C.* § 722 provides in relevant part: "(a) . . . in determining the best interest of the child, the Court shall consider all relevant factors including:

(1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;

(2) The wishes of the child as to his or her custodian(s) and residential;

(3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residence of the household or persons who may significantly affect the child's best interest;

(4) The child's adjustment to his or her home, school, and community;

(5) The mental and physical health of all individuals involved;

(6) Past and present compliance by both parents with their rights and responsibilities to their child under § 701 of this title; and

(7) Evidence of domestic violence as provided for in Chapter 7A of this title."

she had been abandoned by Mother, her concerns now are that she is afraid that she may be taken away and have to live with her birth Mother who she does not wish to see. Dr. Eppes described in detail J.'s description of her relationship with Stepmother, the types of things that they do together and the fact that there is nothing about Stepmother that J. does not like.

(3) *The interaction and relationship of the child with immediate and extended family members, individuals cohabiting with the parent and any other residence of a household or persons who may significantly affect the child's best interests.* With the exception of her half-brother, C., J. has never had a relationship with, nor does she know members of Mother's household, that being D.C. or his children. With regard to her brother C., J. and C. have always had a close relationship and it appears that they both miss each other. Father indicated that he would like to see J. and C. re-establish their relationship and Dr. Eppes opined that it was important for J.'s well being that she maintain a relationship with C., provided that the time they spend together was monitored and supervised. Even following the granting of a TPR Petition, the Court sees no reason why the relationship between these two siblings could not be maintained, provided of course that Mother would permit it and that as Dr. Eppes indicated, it be monitored and supervised so as not to detrimentally affect J.'s fragile emotional state. With regard to J.'s relationship with Mother, that is another matter. The relationship is a negative, one that has left this child with not only a sense of abandonment, but a fear that Mother will be allowed to step back into her life and thereby disrupt the loving stable relationship the child has developed with Stepmother.

In contrast, J.'s relationship with her Father and paternal grandmother is strong and the development of her relationship with Stepmother and M. have added much to J.'s life. Father and paternal grandmother were the primary care givers most of this child's life. Stepmother has come in and filled a role sorely needed in this young girl's life. Stepmother as a trained interpreter working with children with disabilities at the Delaware School for the Deaf, is familiar with issues involving J.'s ADHD, has been intimately involved with J.'s health, care and counseling and provides a much needed safety net for this child. She very much wishes to adopt J. The bond between Stepmother and J. has developed into a strong close caring relationship, the type a mother and daughter should have. Likewise, in M., J. has an older sister with whom she can share experiences and who will serve as a positive role model as J. enters the challenging teen years.

(4) *The child's adjustment to his or her home, school and community,* J. obviously has emotional difficulties but they do not appear to be caused by any of these factors. She has always had and is expected to continue to maintain the stability of a home with her father and it appears that any adjustment issues that may have resulted from leaving her paternal grandmother's home, although none were presented, are clearly outweighed by the positives arising out of J.'s relationship with her Stepmother and M.

(5) *The mental and physical health of all individuals involved.* Mother, Father and Stepmother all appear to be in generally good physical health and, while Father and Stepmother are not plagued by any mental health issues, Mother has been counseled by Pam Djakovich, a L.C.S.W. and certified alcohol counselor at People's Place since August of 2001. According to

Ms. Djakovich, Mother suffers from major depression resulting from her own parental abandonment issues. Ms. Djakovich testified that while Mother has a history of drug and alcohol abuse in the past, Mother claims to be clean at the present time. While she was aware that Mother did not complete her Court Ordered drug diversion program, Ms. Djakovich opined that Mother's counseling with her during the two month period preceding the Court's hearing was an adequate substitute. Ms. Djakovich believes that there is a moderate risk that Mother could revert back to her prior substance abuse behavior. J. is currently being treated for ADHD and major depression. She receives anti-psychotic drugs as prescribed by Dr. Bhatt, and counseling on a regular basis with Dr. Eppes. While her condition has been, according to Dr. Eppes, "up and down", J. has shown recent signs of regression. J.'s condition is such that Dr. Eppes does not believe that J. and her Mother will ever have a good relationship, but, as birth Mother, Mother will always have some role in daughter's life. Dr. Eppes indicated that even assuming that J.'s condition dramatically improved and that she moved out of her current "compromised" state, the likelihood of a positive relationship developing between J. and Mother would be limited to a mere possibility and that even then, it would be conditioned on a lot of "ifs" which, based on Dr. Eppes' familiarity with J. over the past year and a half, she believes that it is not likely to occur. In order for J. to develop any type of relationship with Mother, Dr. Eppes opined that it would be necessary for J. to emerge out of her anxiety and depression for a significant period of time, for her condition to stabilize, and, additionally, Mother would need to meet with daughter's therapists sufficiently to develop an understanding of her role and daughter's needs. Dr. Eppes did not believe these conditions were likely to occur.

(6) With regard to *the past and present compliance by both parents with their rights and responsibilities to their child under § 701 of title 13,* Mother has rarely lived up to her responsibilities as a parent, abandoning her daughter in its infancy, failing to support the child financially, and showing absolutely no interest in her daughter's compromised emotional state or needs, despite repeated requests by Father and Dr. Eppes.

(7) *Evidence of domestic violence.* There is no evidence of domestic violence on the part of either Mother or Father.

Taking into consideration all of these factors, the evidence is quite clear and convincing that termination of Mother's parental rights is overwhelmingly in this child's best interest so as to rise to the level of being essential to this child's well-being.

## VI. CONCLUSION

In summary, I, find that there is clear and convincing evidence that both the statutory ground of abandonment has been proven by Petitioner, and that it is in the best interest of this child that Mother's parental rights be terminated so that the child may be freed for adoption by Stepmother, and therefore, an Order will enter to that effect concurrent with the issuing of this decision.