IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ADRIA BROCK, | § | |
| | § | No. 125, 2021 |
| Respondent Below, | § | |
| Appellant, | § | Court Below: Family Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | File No. 20-01-18TN |
| DEPARTMENT OF SERVICES FOR | § | Petition No. 20-02068 |
| CHILDREN, YOUTH, AND THEIR | § | |
| FAMILIES | § | |
| | § | |
| Petitioner Below, | § | |
| Appellee. | § | |

Submitted: December 1, 2021
Decided: February 10, 2022


Before **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices.


Upon appeal from the Family Court. **AFFIRMED.**


Phillip Renzulli, Esquire, Law Office of Edward J. Fornias, Wilmington, Delaware, for Appellants, Adria Brock.

Jonathon C. Harting, Esquire, State of Delaware Department of Justice, Wilmington, Delaware, for Appellees, Department of Services for Children, Youth, and Their Families.

Renee D. Duval, Esquire, Office of the Child Advocate, Wilmington, Delaware, for Appellees, Office of the Child Advocate.



**VAUGHN**, Justice:

Adria Brock[1] ("the Mother") appeals from a Family Court decision terminating her parental rights over her daughter ("K.C." or "the child"). In its decision, the Family Court found that the Department of Services for Children, Youth, and Their Families ("DSCYF") established one of the statutory grounds for terminating the Mother's parental rights. The ground found to exist was that the Mother's parental rights over K.C.'s siblings were involuntarily terminated in a prior proceeding. At the time of the termination hearing, this statutory ground was found at 13 *Del. C.* § 1103(a)(6) and provided for termination where "[t]he respondent's parental rights over a sibling of the child who is the subject of the petition [had] been involuntarily terminated in a prior proceeding."[2] The Family Court also found that termination of the Mother's parental rights was in the best interests of the child.

The Mother argues on appeal that Section 1103(a)(6) violates her right to due process under the federal and state constitutions because it "creates an irrebuttable presumption that reunification of a parent and child is not in the child's best interest."[3] Stated differently, as applied in this case, the Mother argues that the statute violates the federal and state constitutions because "it creates a presumption that she is unfit to parent any child presently solely because her parental rights [over]

---

[1] "Adria Brock" is a pseudonym used for the Mother.
[2] The General Assembly amended the Code on September 20, 2021, and this ground for termination can now be found at 13 *Del. C.* § 1103(a)(7). The provision now provides for termination where "[t]he respondent's parental rights over another child have been involuntarily terminated." For purposes of this opinion, we will refer to this ground as Section 1103(a)(6).
[3] Opening Br. at 15.

2

older children were previously terminated in North Carolina."[4] The Mother also claims that "[t]he statutory 'best interest' of the child factors set out under 13 *Del. C.* § 722 do not sufficiently address a parent's present ability to provide adequate care for the child";[5] that "DSCYF did not present evidence or argument during the trial to support a finding under 11 *Del. C.* § 1103(a)(6) that the Appellant was unfit and that termination of parental rights was in the child's best interest";[6] and that "[t]here is insufficient evidence under the clear and convincing standard to demonstrate that the parent is unfit under a best interest of the child analysis."[7] After considering each of the Mother's arguments, we have concluded that the Family Court's decision should be affirmed.

## FACTS AND PROCEDURAL HISTORY

K.C. was born prematurely on March 21, 2018. The identity of the child's father is unknown. Before K.C.'s birth, the Mother had three other children. In 2011, her parental rights to all three of those children were terminated involuntarily while the Mother was living in North Carolina. At some point subsequent to the termination of her parental rights of the three children in North Carolina, the Mother was diagnosed with schizophrenia.

---

[4] *Id.* at 16.
[5] *Id.* at 17.
[6] *Id.* at 22.
[7] *Id.* at 25.

While the Mother was in Christiana Care Hospital giving birth to K.C., she exhibited bizarre behavior, including being agitated that the child was not a boy. DSCYF received a hotline report the day after the child's birth expressing concerns for the Mother's mental health. The Mother was evaluated by the hospital's Psychiatry Department, and it was determined that she could not make informed decisions at that time. Because of her premature birth, the child remained in the hospital until May 9, 2018. During that time, the Mother was treated by the medical personnel at Christiana Care for her diagnosis of schizophrenia. When it came time for the child to be discharged, DSCYF determined that the Mother was incapable of caring for a newborn because of her mental health. As a result, on May 9, 2018, DSCYF filed an *ex parte* petition for custody in the Family Court. Emergency temporary custody was awarded to DSCYF that day, and, because of the lack of a suitable relative, the child was placed in foster care. The order awarding emergency temporary custody to DSCYF noted that the Mother was "not stable due to mental health issues."[8]

A Preliminary Protective Hearing was held on May 16, 2018. The court found that the child was dependent due to the Mother's mental instability and her parental rights termination in North Carolina. At an Adjudicatory Hearing held on June 29, 2018, the Mother stipulated that the child was dependent due to her mental health

---

[8] Opening Br. Ex. C.

4

and child welfare history. At the time of the hearing, the Mother was being treated at Christiana Care and was in compliance with a medication plan. At that hearing, the Mother's DSCYF investigation worker noted that she had made a "complete turnaround"[9] since her case began.

DSCYF presented a case plan to the Mother on July 12, 2018, which was entered into evidence during an August 8, 2018 Dispositional Hearing. The case plan included the following elements: 1) Mental Health and Coping Skills; 2) Daily Parenting Behavior Routines and Basic Needs; and 3) Management of Financial Resources.

The Mother obtained housing with Shawn Wilson, who still resides with her as a support person. Shawn lives with the Mother to make sure there are no safety issues, such as forgetting to turn off the stove. At the time of the Dispositional Hearing, the Mother was unemployed but was receiving Social Security Disability Income and food stamps. She was also enrolled at Dawn Career Institute for Medical Coding and Billing, which guarantees job placement after graduation. DSCYF reported at the Dispositional Hearing that it had assigned Ms. Magana-Luna as a Family Interventionist for the Mother. Ms. Magana-Luna supervised the Mother's weekly visits with the child and reported her observations back to DSCYF. Ms. Magana-Luna conveyed to DSCYF that, during her visits, the Mother was attentive

---

[9] Opening Br. Ex. E at 3.

to the child's needs. The Mother was also continuing to see a psychologist, Dr. Leland Orlov.

Review Hearings were held on November 15, 2018 and February 19, 2019. Ms. Magana-Luna reported that although the Mother was consistent with her visitation and was attentive to the child's needs, she was concerned with the Mother's ability to properly care for and interact with the child. Ms. Magana-Luna noted that the Mother had some difficulty in feeding the child and that she required redirection and support to properly care for the child. Further, it was reported that the Mother was using the oven to heat her home when the house's heating unit was out of service. Ms. Magana-Luna also informed the court that the Mother was having difficulty with her finances. In the November hearing, the Mother's Court Appointed Special Advocate testified that the Mother had lived with an elderly roommate who passed away in the Mother's home in May 2018 and that the Mother did not recognize the person was deceased until three days had passed. The Mother only contested this testimony by stating that it was two days, not three.

On April 4, 2019, DSCYF filed a Motion to Change Goal, seeking to change the goal from reunification to Termination of Parental Rights and Adoption ("TPR and Adoption"). At a Permanency Hearing on June 25, 2019, Dr. Orlov was called to give testimony as to whether the Mother would ever possess the cognitive capability to care for child on her own. Dr. Orlov testified that he did not believe

the Mother is capable of independently parenting the child. He recommended the Mother continue therapy for another year and then have another evaluation. Because of this, the court stayed DSCYF's Motion to Change Goal. Due to reassignment of the case to another Family Court judge, a new Permanency Review hearing was held over two days in October 2019. The court granted the Motion to Change Goal to add TPR and Adoption as a concurrent goal because, although the Mother had been compliant with her case plan, no mental health professional was able to state that the Mother was capable of parenting on her own.

The Mother stopped seeing Dr. Orlov, and in May 2020, she began therapy with Mr. McCollum, a mental health counselor. Mr. McCollum reported to DSCYF that he believed the Mother had made a turn around and suggested they begin trial reunification. Because of this progress, DSCYF did not proceed with the TPR petition and instead began a trial reunification plan with the Mother, starting with unsupervised day visits in August 2020. The Mother and Mr. McCollum identified three support people to assist the Mother in these visits.

At a Permanency Hearing held on August 31, 2020, DSCYF testified that it was concerned about the Mother's boyfriend, Blake Scott. The concerns stemmed from a meeting between a DSCYF treatment worker, Ms. Mayo, and Mr. Scott. During the meeting, Mr. Scott was verbally aggressive towards Ms. Mayo. Ms. Mayo also stated that Mr. Scott seemed to be in control of the Mother and would

7

often not allow her to speak and would answer for her. Ms. Mayo also voiced concerns because Mr. Scott's teenage daughter had alleged to DSCYF that Mr. Scott had physically abused her. During the hearing, the Mother stated that she was no longer with Mr. Scott. Ms. Mayo expressed her doubts that the Mother's relationship with Mr. Scott was actually over.

On September 9, 2020, DSCYF began another trial reunification, beginning with one overnight visit per week. During the third week of this plan, Ms. Danzy, one of the Mother's supports, went to the Mother's home to check on her and the child. Ms. Danzy testified that Mr. Scott was at the home when she arrived. According to Ms. Danzy, the Mother left with the child without first feeding the child. The Mother and the child slept at Mr. Scott's home that night. DSCYF stated that this was against its express wishes, and that it had told the Mother on several occasions not to have Mr. Scott around the child. Because of this event, DSCYF reverted to supervised visits with the Mother. DSCYF was concerned that the Mother was not capable of making rational decisions and referred her to Dr. Rachel Brandenburg, a psychologist, for a forensic evaluation.

The Mother's employment was also precarious during this time. After graduating from her medical coding classes, the Mother took a job at Trans-World Collections. However, on September 14, 2020, the Mother resigned from that position due to being disciplined on the job. The Mother then took a job with

Walmart but was fired shortly thereafter. She then found a janitorial job at BJ's Wholesale Club but was also fired from that job. As of the TPR hearing, the Mother had obtained a job as a security guard. However, as late as January 2021, the Mother was continuing to have issues with overdrafts on her bank account.

The Family Court held a two-day TPR hearing on February 16, 2021, and March 5, 2021. DSCYF alleged two statutory grounds for termination of parental rights: failure to plan adequately for the child's needs under 13 *Del. C.* § 1103(a)(4), and the involuntary termination of K.C.'s older siblings under 13 *Del. C.* § 1103(a)(6). DSCYF acknowledged that the Mother was compliant with her case planning. However, issues were raised regarding the Mother's capability to parent on her own. At the hearing, Dr. Brandenburg testified regarding her Forensic Psychological Evaluation of the Mother. She testified that although the Mother's schizophrenia treatment had suppressed her more outward symptoms, such as hallucinations or delusions, she still exhibited schizophrenic symptoms with regard to her social cognition and ability to read social cues. Dr. Brandenburg referred to the Mother leaving the dead body in her home for two (or three) days, her difficulty interacting with the child, and her decision to have Mr. Scott around the child as manifestations of those symptoms. When asked about the Mother's social cognition in the context of parenting, Dr. Brandenburg stated the following:

> One of the things—you know, [the Mother], I think, can
> probably take a test or quiz on parenting and answer all of

9

the questions correctly. I think she'd be able to learn. But it's her application of that learning that's difficult and the adapting to changes. A child is very different when they're three months old to when they're three years old. And those changes happen throughout. So . . . when they're done with baby food, how do we transition to solid food? Those kinds of things would be really difficult for her to problem solve on her own and that initiative to do. Understanding when to call the doctor versus when to just watch and see . . . that would be very difficult for her to figure out.[10]

Dr. Brandenburg further testified that due to the Mother's cognitive deficiencies, she would be unable to discharge her duties as a parent without high risk to K.C.

The child has resided in the same foster home since May 2018. She refers to her foster mother and father as "Ma-ma" and "Pop-Pop." The child is healthy and on track for her age, developmentally and cognitively.

On March 30, 2021, the Family Court entered an order terminating the Mother's and the Unknown Father's parental rights. The court first found that there was not clear and convincing evidence that the Mother had failed to plan under Section 1103(a)(4), as she had been consistent in her case planning. The court did, however, find that there was clear and convincing evidence that the Mother's parental rights had been terminated in the past, specifically the termination of her parental rights in 2011 in North Carolina. Turning next to the best interests factors set forth in 13 *Del. C.* § 7229(a), the court concluded that clear and convincing

---

[10] App. to Answering Br. at B18-19.

evidence existed to find that the termination of the Mother's and Unknown Father's parental rights was in the child's best interests.

## STANDARD OF REVIEW

When reviewing the decision of the Family Court to terminate parental rights, this Court conducts a "review of the facts and law, as well as the inferences and deductions made by the trial court."[11] "Conclusions of law are reviewed *de novo*."[12] "To the extent that the issues on appeal implicate rulings of fact, we conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by the record and are not clearly wrong."[13] "Moreover, this Court will not substitute its own opinion for the inferences and deductions made by the Trial Judge where those inferences are supported by the record and are the product of an orderly and logical deductive process."[14] Our review is limited to an abuse of discretion when the trial judge has correctly applied the appropriate law.[15]

## DISCUSSION

Under Delaware law, a trial judge must conduct a two-step analysis when deciding whether or not to terminate parental rights.[16] First, the judge must

---

[11] *Powell v. Dep't. of Servs. for Children, Youth & Their Families*, 963 A.2d 724, 730 (Del. 2008).
[12] *George v. Dep't of Servs. for Children, Youth & Their Families (DSCYF/DFS)*, 150 A.3d 768, 2016 WL 6302525, at *4 (Del. Oct. 27, 2016) (TABLE).
[13] *Powell*, 963 A.2d at 731.
[14] *Solis v. Tea*, 468 A.2d 1276, 1279 (Del. 1983).
[15] *Powell*, 963 A.2d at 731.
[16] *Id*. at 731.

determine whether there is clear and convincing evidence that one of the grounds for termination enumerated in 13 *Del. C.* § 1103(a) has been met.[17]   If one of the enumerated grounds for termination has been met, the trial judge next determines if there is clear and convincing evidence that termination of parental rights is in the best interests of the child as defined under 13 *Del. C.* § 722.[18]   Under the best interests standard, DSCYF must prove by clear and convincing evidence that termination of parental rights is essential to the child's welfare.[19]

The Mother first contends that 11 *Del. C.* § 1103(a)(6) violates her federal and state constitutional rights to due process because it creates an irrebuttable presumption that she is an unfit parent solely because her parental rights in other children were previously terminated and that reunification of her with her child is not in the child's best interests.   She relies upon United States Supreme Court decisions and decisions of this Court that have held that a parent's parental rights over a child are constitutionally protected.[20]

This same contention, however, was rejected by this Court in *Sampson v. Division of Family Services*.[21]   In that case, as here, the Family Court terminated a

---

[17] *Id.*

[18] *Id.*

[19] *Barr v. DSCYF*, 974 A.2d 88 (Del. 2009); *In the Matter of Derek W. Burns, a minor child*, 519 A.2d 638 (Del. 1986).

[20] *Stanley v. Illinois*, 405 U.S. 645 (1972); *Quillon v. Walcott*, 434 U.S. 246 (1978); *Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Kelly Stevens*, 652 A.2d 18 (Del. 1995); *Orville v. Div. of Fam. Servs.*, 759 A.2d 595 (Del. 2000).

[21] 868 A.2d 832 (Del. 2005).

parent's parental rights where the statutory ground relied upon was the involuntary termination of the parent's parental rights over another child in a previous proceeding. In *Sampson*, we framed Sampson's contention as follows:

> Sampson claims that 13 *Del. C.* § 1103(a)(6) violates her right to due process of law because the statute creates a presumption that she is unfit to parent any child presently or in the future, solely because her parental rights to her older children were previously terminated.[22]

We rejected her contention and stated:

> Sampson argues that by establishing that prior termination as a basis for terminating her rights to a different child, Section 1103(a)(6) violates procedural due process by denying her the opportunity to show that despite the prior termination, she is fit to continue as Samuel's parent. The short and dispositive answer is that that statute does not deny her that opportunity.[23]

We explained this ruling as follows:

> Sampson claims that that the "prior termination" provision of Section 1103(a)(6) precludes a parent from demonstrating his or her ability to care for a child, thereby creating a risk that the parent will be deprived of her parental rights on grounds that are contrary to fact. That argument fails, because by requiring DFS to prove by clear and convincing evidence that termination is in the child's best interests, the current Section 1103(a)(6) procedure permits inquiry into a parent's fitness to rear the particular child whose custody is at issue.[24]

We continued:

> Contrary to Sampson's argument, Section 1103(a)(6) does

---

[22] *Id.* at 834-35 (citations omitted).
[23] *Id.* at 835.
[24] *Id.* at 835-36.

> not foreclose judicial inquiry into her fitness to care for one child solely because her parental rights in her older children had previously been involuntarily terminated. By requiring DFS to prove that termination of parental rights is in the child's best interest, that statute protects against an erroneous deprivation of parental rights.[25]

We will follow the precedent established by *Sampson* and for the reasons given there we reject the Mother's contention that Section 1103(a)(6) deprives her of her constitutional rights to due process by creating an irrebuttable presumption that she is an unfit mother and that reunification of her and her child is not in the child's best interests.

The Mother attempts to distinguish *Sampson* factually because in *Sampson*, the parent failed to work cooperatively with DSCYF to be reunited with the child. The Court noted that "Sampson's parental rights were terminated not only because her parental rights over her other children had been involuntarily terminated, ***but also*** because, as a result of her failure to work cooperatively with DFS to be reunited with [the child], it was also in [the child's] best interest to have her parental rights over him terminated."[26]  In this case, by contrast, the Family Court found that DSCYF failed to prove by clear and convincing evidence that the Mother had failed to plan for the child's needs, stating that "[s]ince [the child] came into DSCYF custody, Mother has cooperated with virtually all DSCYF's requests and has

---

[25] *Id.* at 836.

[26] *Id.* at 836 (emphasis in original).

substantially completed her case plan."[27] This factual distinction is no avail to the Mother. It has no bearing on her contention that Section 1103(a)(6)—a separate ground for termination—creates an unconstitutional, irrebuttable presumption of unfitness.

The Mother also challenges the use of the best interests factors set forth in 13 *Del. C.* § 722 in TPR determinations. She argues that these factors do not sufficiently address a parent's present ability to provide adequate care for the child. She elaborates on this argument by contending that the Section 722(a) factors do not specifically address parental unfitness and do not contain a specific provision under which a parent can present evidence that his or her circumstances have changed and the parent is currently fit. The U.S. Supreme Court cases of *Stanley v. Illinois* and *Santosky v. Kramer,* she contends, hold that due process requires that a court find that a parent is unfit before terminating the parent's parental rights, and the Section 722(a) factors do not require a finding of unfitness.

We think that the Mother misunderstands the best interests analysis. The Section 722(a) factors are not to be applied in a narrow, inflexible manner. They call for a broad, flexible inquiry to be made in determining what is in the best interests of a child for purposes of termination of parental rights. Section 722(a) provides that in making a best interests determination, the Family Court shall

---

[27] Opening Br. Ex. T at 9.

15

"consider all relevant factors including" the eight factors enumerated therein.[28]

In *Stanley,* the court held that a presumption under Illinois law that an unwed father was presumed to be unfit to raise his children violated the Equal Protection Clause, and that the Due Process Clause entitled the father to a hearing on his fitness as a parent.[29] The holding in *Santosky* is that the burden of proof in a termination of parental rights proceeding be "by at least clear and convincing evidence."[30] While those cases speak of fitness, as well as neglect, they do so in the context of the holdings of the cases and do not set forth any specific constitutional rule regarding the term "fitness." We do not see any constitutional infirmity in the requirement of Section 1103(a) that termination of parental rights be in the child's best interests or in the use of Section 722(a) to make that determination. The best interests factors in Section 722(a) give the trial court ample discretion to consider the parent's fitness in determining whether termination of parental rights is in the child's best interest.

---

[28] The eight enumerated factors are: (1) The wishes of the child's parent or parents as to his or her custody and residence arrangements; (2) The wishes of the child as to his or her custodian or custodians and residential arrangements; (3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with the parent of the child; (4) The child's adjustment to his or her home, school, and community; (5) The mental and physical health of all individuals involved; (6) Past and present compliance by both parents with their rights and responsibilities to their child under Section 701 of Title 13; (7) Evidence of domestic violence as provided for in Chapter 7A of this title; and (8) The criminal history of any party or any other resident of the household including whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense.

[29] 405 U.S. 645, 646 (1972).

[30] 455 U.S. 745 (1982) ("We hold that the Due Process Clause of the Fourteenth Amendment demands more than [a fair preponderance of the evidence standard]. Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence.").

16

The next argument made by the Mother that we consider is an argument that DSCYF "focused the majority if not the entirety of the proceedings on the parent's failure to case plan under Section 1103(a)(5), and failed to provide any evidence or even argument, with any specificity, to support a finding that the Appellant was unfit to care for the child and that termination was in the child's best interests under a Section 1103(a)(6) analysis."[31]  This argument seems to suggest that DSCYF must organize its evidence relevant to a best interests determination as a connection to the statutory factor it relies upon, and that since here DSCYF offered two statutory factors, it was necessary for it to offer two separate best interests analyses, one for each statutory factor.  This argument misconceives the requirements of Section 1103.  Under Section 1103, the inquiry is a two-step analysis.  The trial judge first determines whether there is clear and convincing evidence that one of the statutory grounds for termination is proven.  If so, the trial judge next considers whether termination is in the child's best interests.  They are separate steps in the process, and all of the evidence relevant to the child's best interests on the question of termination of the Mother's parental rights could be considered on that issue once the trial judge found that the Mother's parental rights over the child's siblings had been involuntarily terminated in a prior proceeding.

The Mother's final contention is that there was insufficient evidence to

---

[31] Opening Br. at 22-23.

establish by clear and convincing evidence that it was in the child's best interests to terminate the Mother's parental rights. However, the Family Court considered ample evidence that supported a finding that the Mother was unfit and termination of her parental rights was in the child's best interests. In so finding, the court found that Section 722(a) best interests factors (3), (4), (5), (6), and (8) weighed in favor of termination of parental rights, (1) and (7) weighed against, and factor (2) was neutral.

In this case, the Mother was observed by medical personnel at Christiana Care Hospital to be unable to make informed decisions on her own and was not stable. They did not believe that the Mother was capable of caring for K.C. Although there was some improvement in her condition at times, when the termination of parental rights hearing was held three years later, Dr. Brandenburg was of the opinion that the Mother was unable to discharge her duties as a parent without high risk to the child. It does not appear that any of the mental health professionals who had contact with the Mother were willing to express the view that she was capable of caring for the child without supervision. We find no abuse of discretion in the trial judge's conclusions that by clear and convincing evidence it was in the child's best interests that the Mother's parental rights be terminated.

## CONCLUSION

For the foregoing reasons, the judgment of the Family Court is affirmed.

18